1,WALTZER, Judge.
STATEMENT OF THE CASE
The State of Louisiana, Department of Social Services, Office of Community Services (OCS) appeals from a judgment of Orleans Parish Juvenile Court rendered on 25 May 1999 that found the State failed to prove by a preponderance of the evidence that A. C. is a child in need of care.
STATEMENT OF FACTS
A. C. was born at West Jefferson Hospital on 21 May 1998. The child’s birth record from West Jefferson notes delivery of an 8 pound 8 ounce term female, born by augmented vaginal delivery. The progress notes say, “no problem during delivery.” The child’s APGAR score was % on a scale of 1-10, with 10 being most responsive and most favorable physical and mental conditions. The child was referred for X-ray because of shoulder dystocia during delivery. The notes for 22 May 1998 show the infant doing well overall, no problem with feeding, urination or stooling. According to the West Jefferson record, a pediatric neurologist diagnosed and will manage Erb’s Palsy on right arm. The child was described as “alive and well” and subject to be discharged. She was to follow-up | ¿with Dr. Wolf, her pediatrician, at one to two weeks, and with neurologist Dr. Pena in three weeks.
Detective Aaron Blackwell of the New Orleans Police Department’s Child Abuse Unit testified that less than three months later, on 16 August 1998, he was summoned to West Jefferson Hospital by hospital staff who suspected possible foul play involving A. C. After having met with staff members and the child’s parents, and having examined the child’s X-ray, he had several concerns.
The child had retinal hemorrhages that could signal Shaken Baby Syndrome. Detective Blackwell described the syndrome, associated with a child’s being shaken, as resulting when the brain moves in the skull, causing retinal damage and red blood around the child’s pupils. A long fracture that appeared on A. C.’s X-ray was inconsistent with a normal drop or fall. Based on these observations and his experience, he was concerned about possible abuse by the caretakers or someone involved with the child.
Detective Blackwell then asked Dr. Scott Benton, the NOPD’s regional expert on child abuse, to examine the child and assist in the investigation of the cause of the child’s injuries. The parents’ denial that the child had been dropped or intentionally injured was inconsistent with the doctors’ findings. The doctors said the child could not have received her head, eye and other injuries from the simple diarrhea and vomiting for which her mother and grandmother had brought her to the hospital. Hospital staff advised Detective Blackwell that the child had been born there, that the birth was difficult and that some injury might have been sustained at the time of birth.
The detective testified that at the inception of the investigation, it was clear that there were several suspects who had access to the child, including the parents, | ^grandparents and other relatives. He testified that there was some talk at the hospital initially that the parents had claimed it was possible the hospital had hurt the child, but he was unable to confirm or deny this hypothesis. During the course of the NOPD investigation, the Crime Lab personnel took photographs of the child. Detective Blackwell contacted Child Protection, whose agent, Thomas North, had the child placed temporarily with its aunt, a voluntary placement to which the parents agreed.
Late at night on 12 October 1998 Detective Blackwell was advised that Children’s Hospital had called in another suspected child abuse incident involving A. C. The child had been brought to Children’s for *670 physical therapy, and after a few minutes the mother showed the therapist an indentation in the child’s skull attributed by the hospital staff to an impact injury of unknown origin to the skull, causing an indentation the size of a quarter. The child was treated in the emergency room and hospital staff called the NOPD..
The detective examined the child and noticed the injury. He then met with Mr. North again. They continued their investigation and discovered that the previous Friday, the child had attended a physical therapy appointment at Children’s and at that time was not observed to have had a head injury. The parents took the child from the aunt for the weekend, and on Monday, during the course of a scheduled physical therapy appointment at Children’s, the second reported injury was discovered.
In the course of his investigation of the second reported injury, Detective Blackwell met with the child’s parents and maternal grandmother. No one in the family knew how the child had been injured. The detective’s investigation did not uncover a cause for the child’s second reported injury and concluded that some 14type of child abuse occurred while the child was in the custody of its relatives. He concluded that the child had injuries attributable to the difficult birth as well as a head injury traceable to the first reported incident and a separate head injury related to the second reported incident. He did not make an arrest concerning the latter two incidents because he could not determine whether the perpetrator was the child’s mother, father, grandmother or a combination of these three persons.
Thomas North testified that he works as a Child Protection Investigator for OCS. His first contact with the child was on 17 August 1998 at West Jefferson Hospital, where he interviewed Dr. Lovewick, an ophthalmologist, who noticed the child’s retinal hemorrhaging and blood in the eyeball. The doctor and attending nurse indicated that blood in the eyeball was evidence that the injuries has been sustained some time prior to the child’s admission to West Jefferson. According to Mr. North, this evidence demonstrated that the injury to the child’s head had not been caused at or by West Jefferson.
At West Jefferson, Mr. North interviewed nurse Kathy Moran who advised that when the child was brought in on Saturday, 15 August [1], she was responsive, but was comatose on Sunday, 16 August. Head nurse Leslie Klimn showed Mr. North what she identified as X-rays and scans showing the child’s two skull fractures as well as bleeding behind the eye. Dr. Lovewick also showed Mr. North the retinal hemorrhaging.
On cross-examination, Mr. North testified that the child’s grandmother told him that three weeks prior to the West Jefferson admission she drove the child, who was in a car seat, for six hours in her car.
|sMr. North testified concerning the investigation of the child’s second reported injury, in October 1998. According to Mr. North, neither OCS nor Family Services had authorized the child’s return to its parents’ custody immediately prior to the second reported injury; in fact, the agency was unaware that the aunt had transferred custody back to the parents.
Mr. North confirmed that his agency reinitiated its investigation following the second reported injury. He accompanied Detective Blackwell to Children’s and interviewed the child’s mother and grandmother and the attending nurse. According to the mother, she and her husband went to the custodial aunt’s home and took the child to their home the previous night. The child’s head was not indented at 11:30 the next (Monday) morning when she combed the child’s hair. She first noticed *671 the dent some hours later, during the Children’s physical therapy session. She offered no explanation for the injury and denied any falls or accidents.
The Children’s emergency room physician, Dr. Awotwi, said the injury observed on 12 October appeared to have been made by a blunt object and did not appear to be accidental. According to Dr. Awotwi, the fractures showed partial healing, and there was no swelling or bleeding. After Mr. North reviewed the medical documents on the depressed skull fracture, which also indicated the injury was not accidental and was caused by a blunt object, he concluded the child had not been supervised adequately.
Mr. North interviewed the father, who confirmed that he and his wife took the child home Sunday night, and that the child was not having any apparent problems at that time. He offered no explanation for the injury. Mr. North interviewed the child’s custodial aunt, who denied that the child had fallen or been | (injured. The maternal grandmother was interviewed and said she had not noticed any skull depression on Monday. She was present at the therapy session when the depression was discovered. She offered no explanation for the child’s injuries, but denied that the parents were involved.
Mr. North interviewed Dr. Dargon of West Jefferson Hospital who had examined the child on 22 September for a complete physical and on 9 October. The doctor described the child as fine, having no skull depression. Mr. North concluded that the child suffered the depressed skull fracture some time between Friday, 9 October and Monday, 12 October. During that time, only the child’s parents and aunt had contact with the child. Mr. North also interviewed the attending physician, Dr. Dessell,, who said the injuries were consistent with Shaken Baby Syndrome.
Mr. North concluded that initially OCS felt comfortable with the child’s placement with the aunt; however, it was evident that the child had not been protected and in the best interest of the child, the child should be placed in State custody. On cross-examination, he testified that the agency did not petition to place the child in State custody after the first incident, preferring placement with a relative, in this case, the child’s aunt. The report showed the aunt’s home to have been clean, neat and orderly, and the parents appeared to be concerned and loving. The agency felt that placement with the relative was appropriate, that the investigation was in its early stages, and that the child would be safe until the investigation was completed. After the investigation of the second reported injury, the agency decided it was in the child’s best interest to petition for State custody.
Dr. Kenneth Ward, pediatric radiologist at Children’s, was accepted as an expert in pediatric radiology. Dr. Ward testified that he saw A. C. at Children’s in |7October, 1998. With Dr. Benton, who specializes in child abuse cases, he reviewed A. C.’s studies from West Jefferson Hospital and from Children’s. Dr. Ward found from a CT scan of 16 August 1998 that at that time the child had a fracture extending across the suture that separates the two sides of the skull. There was a small amount of soft tissue swelling overlying the left top of the skull and, intracranially, there was extensive necrosis of the brain substance in subacute phase. The brain had suffered extensive damage, to the point that it was globally, universally, totally infarcted. It had lost its blood supply, according to his best estimate, between 12 and 96 hours prior to the scan. The child was admitted to West Jefferson at 11:45 a.m. on 15 August. The scan was performed on 16 August.
It was clear to Dr. Ward that the child’s brain will never recover. There was a small area of blood within the skull overlying the brain that was consistent with a traumatic episode. Thus, there was both external and internal evidence of external trauma to the skull, the result of which *672 was tissue death and beginning degeneration of the child’s brain.
He found that additional traumatic injury caused a partially healing fracture of the child’s right posterior eighth rib. He testified that this type of injury is difficult to cause unless a pointed object has hit the rib cage. He dated the injury at two or three weeks of age or older. He testified that he has not witnessed or been able to find a report of such an injury due to trauma associated with birth. On cross-examination by counsel for the child, Dr. Scott Benton testified emphatically that it is theoretically impossible that the rib fracture occurred at birth.
Dr. Ward also found an acute injury to the child’s distal right humerus (upper arm above the elbow) resulting in a buckle fracture. At the time the child | «presented in August, there was no evidence, such as periosteal reaction or callous formation, to indicate that this was an old injury. Dr. Ward testified the injury was at most seven days old. This type of injury usually occurs in older children who fall while running. In infants, this sort of injury is caused if someone falls on the child or grabs the child, bending the bone by grabbing the child around the elbow. Dr. Ward relied on follow-up films taken at Children’s to support his thesis of traumatic injury.
Dr. Ward pointed out an injury to the child’s right tibia (leg bone), which he described as possibly caused by twisting. According to Dr. Ward, one has to actually take the soft tissue that overlies the bone and twist it to cause this sort of injury. He considered this a suspicious injury; however, because he could not at that time locate a fracture of the tibia, he could not be sure of traumatic genesis. Upon a re-X-ray of the bones, the humoral fracture was identified by a large amount of healing change, and the tibial injury had become much more obvious and much more asymmetric, compared to the opposite side.
According to Dr. Ward, the child also suffered Erb’s Palsy, a palsy of the shoulder caused by neurological damage to the nerves that supply the right arm. He noted changes to the right shoulder joint caused by this condition and a healing fracture of the clavicle that possibly could have been related to birth trauma. The palsy was, in his opinion, unrelated to the child’s other acute or chronic injuries. He concluded that perhaps the right clavicle and right rib injuries could have been related to birth trauma.
Dr. Ward concluded that the August head injury was a high velocity injury and, absent any history of a car accident, he attributed the injury to non-accidental, that is intentional, trauma. The additional August injuries, with the possible [9exception of the broken clavicle and broken rib, were also of a suspicious nature, particularly the humeral and tibial injuries. He felt that the compendium of injuries to multiple bones at the same time and the absence of any traumatic accident were consistent with child abuse. Dr. Ward specifically denied the possibility that the head, humeral and tibial injuries could have been related to birth trauma or to the Erb’s Palsy.
Dr. Ward testified concerning his review of the records of A. C.’s October hospitalization at Children’s. A. C. then had a new skull fracture, a depressed fracture of the right parietal bone. He characterized this injury as unusual and suspicious also, since it requires either the head striking a blunt or pointed object such as the corner of a table, or an object such as a stick, hammer or bat striking the infant’s head. Dr. Ward said there was no essentially new injury to the brain, which he testified had basically liquefied except for the very central portion of the brain. This liquefaction resulted from oxygen deprivation. During such oxygen debt, the blood circulation goes into survival mode, and the blood is shunted to more critical areas. The child’s brain, due to the initial skull injury in August 1998 had suffered such a severe episode of oxygen loss that it had *673 lost all of its substance above the basic centers for surviving. The child still had respiratory centers, some centers for hunger, waking and sleeping, but all centers for higher thought, learning, speech, motor function and visual function had turned to liquid. Dr. Ward testified that if the brain were examined, it would, essentially, pour out into a cup. The brain was non-fune-tional. Dr. Ward explained the liquefaction process, and traced it to the August head trauma.
Because of the multiple episodes of trauma, different mechanisms and in the absence of any type of explanatory history, Dr. Ward concluded that A. C. had |inagain been abused. He concluded that the skeletal fractures will heal, but that the brain has been irreparably damaged and A. C. will never function above what has been described as a baseline vegetative state. Dr. Ward testified that the brain changes he saw in the August films were not consistent with an injury old enough to have been sustained at birth in May 1998. On examination by counsel for A. C., Dr. Ward unequivocally stated that the baby’s skull did not grow softer or become easier to harm as a result of the difficult birth or August head injury. On cross-examination by the parents’ counsel, Dr. Ward noted that although not as THICK as an adult’s skull, a baby’s skull is MORE resilient. He referred to the advantage a child has during birth, that the skull can mold and because it is pliable it will shift and move and will neither ^ak nor depress as readily as an adult’s ^11. Dr, Ward testified that although eie is no exact answer to the question of seem161- & *S s0^er a^er ^ hioo!f flkely that t>ecause of the increased ^ , to the affected region the bone shywnv softer. While the trauma suffirf6 ^°ber might not have been " eni h^^aused the iniurv in August, Dr WaT._, jfusecl tne injury m au sfanKai <. Sieved there was substantial trauma on boq occasions.
Pedia P®nt°n> -Ass^tant Professor of es a LSU School 0f Medicine and Director of the Child Abuse Program at Children’s Hospital, testified as an expert in pediatrics. He was called into this case by Detective Blackwell and took histories from the child’s mother and treating/examining physicians when he arrived on 17 August. According to Dr. Benton, a devastating head injury occurred to A. C. approximately 24 to 48 hours before she arrived at West Jefferson in August 1998. Dr. Benton reviewed the records of the child’s birth in May 1998 and hospitalization in August.
|nDr. Benton testified from the West Jefferson record of A. C.’s birth. A. C. was born at West Jefferson on 21 May 1998 and was released the next day. The child was diagnosed with a right shoulder dystocia, meaning that her shoulder was stuck upon exiting the womb at delivery. Dr. Benton testified without contradiction that it is standard practice to fracture the clavicle or to pull hard on the baby to lessen the risk of brain damage. Once either of the procedures is done, vaginal delivery ensues. A diagnosis of Erb’s Palsy on the right where the dystocia occurred was noted and confirmed by a neurology consult. There was concern that the clavicle had been broken, and X-rays were ordered which showed no fracture. The baby’s APGAR score of nine/nine out of ten/ten was excellent and showed uneventful post-delivery, with the sole exception of the Erb’s Palsy to the right shoulder. The only possible skeletal affect of Erb’s Palsy, according to Dr. Benton, would be a fracture to the clavicle during delivery. According to Dr. Benton, A. C.’s post-delivery films did not show an injury to the clavicle. There was no relationship between Erb’s Palsy and the head and body injuries on which he consulted. On cross-examination by counsel for the child, Dr. Benton testified that the child’s head could have been injured during delivery, but he did not relate the high velocity injuries found in August and October to birth trauma.
*674 Dr. Benton testified that based on his review of the records of A. C.’s August hospitalization at West Jefferson, the ehild was probably suffering from inflicted cerebral injury known as Shaken Infant Syndrome. This conclusion was based on the finding of two pediatric ophthalmologists of retinal hemorrhages in both eyes. This is a finding only consistent with centripetal force injury of significant forces. Additionally, the child had sub-dural and subarachnoid bleeding-bleeding underneath the dura, between the dura and the brain. That is | ^almost always a consequence of severe centripetal force injuries in which the bridging veins between the brain and the dura become sheer, bleeding in that area. The subarachnoid is also a high velocity traumatic injury to the brain. In addition, the child had commi-nuted fractures of both sides of the parietal bone which Dr. Benton called splitting of the suture indicating brain swelling. The fractures themselves are indicative of blunt trauma of high force because this went to both sides of the head. Without a bleeding disorder or accident, which was ruled out in A. C.’s case, such an injury is almost always indicative of Shaken Baby Syndrome. The injury occurs with high speed acceleration and deceleration to the head, in an angular momentum. The head revolves around an axis, from back to front, causing shearing of some vessels that connect the brain to the dura and bleeding. This is similar to the injury causing the child’s retinal hemorrhaging and resulting vision impairment. Dr. Benton also explained that the child suffered hypothic encephalopathy. Over time, there is a degradation of the brains where parts have died and become reabsorbed; the resulting hole is filled with fluid (cystic encephalomalacia). The brain that is dead is reabsorbed and supplanted by fluid and space. This injury occurs when the child is hypoxic, that is without oxygen, over a period of time. Given the other findings, Dr. Benton related this to Shaken Baby Syndrome as well. Apnea, or cessation of ■breathing, is a known consequence of shaking an infant too hard.
On the skeletal survey, the child was noted to have a clavicle fracture on the right, as well as a healing rib fracture in the ninth posterior space and an acute buckle fracture of the distal right humerus. This clavicle fracture, although of a type that can be associated with shoulder dystocia and Erb’s Palsy, was sustained sometime after delivery and before the August West Jefferson hospitalization. The | ^fracture does not appear on A. C.’s post-delivery X-rays. The healing rib fracture was strong evidence of abuse. A posterior rib fracture is rarely seen in accidental trauma because the vertebral process protects posterior ribs. The unique mechanism of a posterior rib fracture involves squeezing to the chest so that the ribs bend around the vertebral process and snap at that point. Dr. Benton said there was a possibility that squeezing during the birth process could have caused the rib fracture. However, since the fracture does not appear on post-delivery X-rays, there is no evidence that the fracture occurred during delivery. A buckle fracture, according to Dr. Benton’s uncontradicted testimony, is generally a grabbing, twisting injury. This is similar to the gripping, twisting injury to the child’s right tibia. The child was also noted to be deaf or significantly hearing impaired.
Dr. Benton described the child’s fractures as caused by “high velocity” force, and the skull fracture demonstrated two separate impacts.
Dr. Benton testified concerning the record of A. C.’s 14 August admission to West Jefferson. At that time, her symptoms were fussiness, vomiting and “not acting right.” According to Dr. Benton, these symptoms were consistent with dehydration, for which she was treated. Vomiting without a history of dian’hea can also be a symptom of central ntfvous system injury. When the child wa^ treated for dehydration, the head injury became known. According to Dr. jenton, it is common, as in *675 this case, that when IV fluids are administered to rehydrate a child who has had an otherwise non-apparent head injury, the water will cause cerebral edema that makes the head injury known. In the absence of being given a history of head trauma, the treating physicians would not have observed the head injury prior to administration of the IV fluids. Rehydration did not appear to improve the child, whereupon Dr. Camille Betar, an infectious disease specialist, was called in |uto see if the continuing decline or deterioration of the child’s state could be related to infection in the brain. A CD scan was performed and the skull fracture and in-tracranial bleeding were observed. The X-rays taken at West Jefferson in connection with the August admission were confirmed by X-rays taken at Children’s, where the child was transferred for treatment of the same injuries.
Dr. Benton opined that the treatment at West Jefferson would have been more effective if the child’s caretakers had noted the history of head trauma. He also testified without contradiction that the lack of outward bruising was not evidence that the child had not been abused. The force mechanisms involved in Shaken Infant Syndrome are such that there need be no external evidence of trauma. The actual shaking 'around the neck axis is sufficient to cause almost all of the injuries seen except for the skull fractures. Dr. Benton described the effect of shaking a baby to shaking a tree: some of the trees branches will break just as some of the child’s brain axons will tear. Frontal injury occurs when these nerve axons break and lose their connection; this happens throughout the brain. The addition of the fractures seen in A. C. are symptomatic of Battered Child Syndrome. This is the logical conclusion when one is presented with a three month old infant with this many injuries and no accident etiology.
Dr. Benton placed the clavicle fracture at sometime between birth and one month prior to the August hospitalization (between 21 May 1998 and 12 July 1998); the two comminuted skull fractures occurred sometime after birth and prior to admission to the hospital in August. He placed the brain injury and retinal hemorrhages 24 to 48 hours prior to the 12 August hospitalization at West Jefferson. The rib fracture occurred sometime between delivery and the August hospitalization.
|15Pr. Benton then testified concerning the child’s October hospitalization at Children’s. Dr. Benton examined A. C. in August at Children’s, and noted a bulging fontanel, indicating significant brain swelling and that the brain was poking through the soft spot on the top of her head. He also noted retinal hemorrhages in both eyes.
The child had been admitted to Children’s on 12 October 1998 subsequent to an injury noticed by her mother during a physical therapy session at the hospital. X-rays showed a depressed skull fracture, and the child was admitted for surgical treatment of the injury.
The emergency room physician raised the possibility that the child’s injuries arose from brittle bone disease, osteogen-esis imperfecta. The child was tested and evaluated by Dr. Casey, Children’s geneticist, and a definitive test was sent to Dr. Peter Byer’s laboratory in Seattle, Washington. Dr. Byer is the foremost authority in osteogenesis imperfecta. The tests revealed that the child’s bones were normal, and she did not suffer from brittle bone disease.
Dr. Benton described A. C.’s depressed skull fracture as having occurred when a focal impact injury occurs or a focal blow strikes the child’s head. The two parts of the skull are bent inwards.
A repeat skeletal survey was done, revealing new injury to the right humerus. There was also new and residual blood in the head. Dr. Benton concluded in the absence of accident history, that A. C. suffered a focal impact injury and possibly some other gripping, twisting injury to the *676 long bones of the body separate and distinct from the injuries noted in the August admission. These new injuries occurred between 28 August and 12 October 1998. Because the child h ¿was brain-damaged after the August injuries, she was incapable of further self-injury.
Dr. Benton did not believe the injuries were caused by accident because the forces involved in many of the different injuries required significant trauma. High velocity trauma caused by accident usually involves big events like motor crashes or falls out of multi-story buildings. This coupled with the lack of external evidence of trauma suggests an angular mechanism of action, such as that discussed above in connection with the diagnosis of Shaken Infant/Battered Infant Syndrome.
Dr. Bonnie Dessell, pediatric critical care physician at LSU Medical Center and Children’s, was accepted as an expert in pediatrics and critical care. Dr. Dessell testified that she was A. C.’s attending physician during her August hospitalization at Children’s. The child was in critical condition when she was admitted; she was comatose, that is, she was not alert and awake and looking around as a well infant would, and her fontanel was bulging. The bulging fontanel was a sign of increased pressure inside the child’s skull. She required a ventilator or respirator, a life support machine.
Dr. Dessell reviewed the records from West Jefferson, the referring hospital, and had the child examined by an ophthalmologist, neurologist and abuse specialist. From her examination of A. C., Dr. Des-sell concluded the child suffered from a text-book classic case of Shaken Baby Syndrome. The syndrome is a consolidation of features including major head injury involving bleeding in the head and severe edema, in combination with retinal hemorrhages and bony findings. Dr. Des-sell concluded from these conditions and from the absence of any history of high-speed motor vehicle accident that the child had |17suffered intentional trauma. She treated the child with Manitol for massive brain edema and provided ventilatory support. A. C. was unable to feed initially and received IV fluids. She was continued on anti-seizure medication.
On cross-examination, counsel for A. C. asked if the child presented at West Jefferson in a non-comatose state, was taken in the hospital for a procedure and comes back in a comatose state would it be fair to conclude that the procedure had something to do with the comatose state. Dr. Dessell replied in the negative. As Dr. Ward testified, the child’s coma could have progressed as the brain swelling caused by the pre-admission trauma became worse. Dr. Dessell testified that she has seen children come in with gunshot wounds to the head who are awake and talking. Then at some later point they decompensate. She also testified without contradiction that the neurologic consequences of Erb’s Palsy would be limited to the child’s affected arm.
The parents offered no expert medical evidence to contradict the testimony of Doctors Ward, Benton and Dessell. They offered lay testimony from the child’s grandmother and mother.
The grandmother denied that she or the child’s parents injured the child. She testified that she, the mother or the father were the child’s sole caretakers and that they were with her constantly with minimal exceptions occurring during the child’s hospitalizations. The grandmother testified that she was with the child “every waking hour,” although she admittedly was employed outside the home working from 11 p.m. until 9 a.m. During that time, the child was in the care of her mother. On cross-examination, the grandmother was presented with the fact of her employment and recanted her earlier testimony claiming to have been with the child “24/7” that is 24 hours a day, seven days a week.
|1SA. C.’s mother testified that she quit her job to care for her child, and did not leave the child with other caretakers, rela *677 tives or otherwise. She denied having injured the child or having seen anyone else injure the child.
The child’s grandmother testified that the only problem she noticed after A. C.’s birth was a difference in the way she carried her right arm. Dr. Pena explained to her that this was a result of Erb’s Palsy. The child began to receive physical therapy treatment approximately a week after her birth. The child was attended by her mother and grandmother during these therapy sessions. The therapists manipulated the child’s arm during the sessions, but did not lift it above her head.
According to the grandmother, in August 1998, her daughter called and advised her that A. C. was crying a lot, so within a half hour of the onset of the child’s crying, they took her to West Jefferson. The grandmother denied that the child manifested any symptoms other than the crying that motivated them to take the child to the hospital. On cross-examination by counsel for the State, the grandmother said the child was also throwing up for a half hour. A. C.’s mother contradicted this testimony. The mother testified that the child had had problems with vomiting well before the August hospitalization, in fact from the week after its birth. According to the mother, she took the child to Dr. Wolf the week after the delivery and mentioned the vomiting problem. According to A. C.’s mother, Dr. Wolf told her not to worry, prescribed some medication, put the child on Pedialyte and advised the mother to call him if the vomiting continued.
The grandmother stayed with A. C. at West Jefferson while the mother took care of the paperwork. A West Jefferson doctor, possibly Dr. Ross, examined A. C. and said she was dehydrated. He admitted the child, and the grandmother remained with her. A nurse took the child to another room to insert an IV; the | ^grandmother heard the child crying intensely “like she was being tortured.” However, under cross-examination, the grandmother admitted she did not know where the child had been taken or whether there were other children in the area, but insisted she recognized her grandchild’s crying. According to the grandmother, the child was not crying before it was taken away and was not crying when it was returned. The child was listless and her eyes had rolled to the back of her head when she was returned to her grandmother and mother. Later that night, the grandmother left the hospital to go to work. The next morning, her daughter called and told her the child was brain damaged and had been taken to ICU. The grandmother returned to West Jefferson. She and her daughter felt that since the child was the only patient in West Jefferson’s ICU and there was no doctor attending to her at the time, the child should be transferred to Children’s. This was done on 17 August 1998. West Jefferson’s discharge summary diagnosed A. C. as having suffered severe brain damage.
The grandmother testified that she saw the child on Sunday night, 11 October, and the child’s skull was not indented at that time. She left the child with her mother, who had sole care of the child until the grandmother and mother took A. C. to Children’s on 12 October for a scheduled physical therapy session. It was at the therapy session that the mother remarked to the grandmother that the child’s skull was indented. The grandmother admitted on cross-examination by counsel for A. C. that something happened to the child while she was in the care of her mother, but back-tracked from this conclusion after counsel for the parents interjected an objection.
A. C.’s father testified that he works at Avondale Shipyards on Monday through Friday and occasionally on Saturday, from 3:00 p.m. to 12:00 a.m. HisJ^wife was the child’s sole caretaker. He denied any knowledge of injury to the child and denied that he was present when any injury to the child occurred.
*678 The Medical Center of Louisiana (MCL) records indicate that A. C. was seen by Dr. Sturgeon for emergency care on 22 July 1998. The complaint was a pulled muscle at the right shoulder. The notes describe the child as having had a shoulder injury at birth which was not improving. A. C. “holds her hand rotated inward and flexed at the wrist. Otherwise she is doing well. Feeding/growing well. Parents put right arm in sack and pin it to clothes. Also doing arm exercises at home. No physical therapy since birth.” This contradicts the grandmother’s claim of consistent physical therapy since late May, 1998. The chart shows no apparent fracture or dislocation at the affected shoulder. The doctor diagnosed Erb-Duchene Palsy and referred the child to the Pediatric Neurology clinic in one or two weeks, recommending physical therapy and return as necessary.
The medical records show that A. C. was seen at MCL by neurologist Dr. C. Duncan on 12 August 1998 for a second opinion concerning the right arm. Dr. Duncan noted the child was gaining weight according to the mother, but also noted that the child was falling on the growth curve, having been in the 95th percentile and birth and now falling to between the 25th and 50th percentile. The child was scheduled to return on 16 September 1998. Dr. Dun7 can supplied the juvenile court through the parents’ counsel a letter dated 7 May 1999 in which she said she has no records concerning A. C. According to the letter:
I do recall seeing her at Charity Hospital for evaluation of a brachial plexopa-thy which she indeed had. I recall being concerned about failure to thrive and the family assured me that they were following instructions from their Pediatrician and would return for follow-up to the Pediatrician. We arranged for testing at Children’s in regard to the brachial plexus problem. She was later |^admitted to Children’s Hospital. I did not see her at Children’s, but did review her Charity Clinic visit in regard to the possibility of head trauma at the time of her visit to Charity. This review was, of course, close to the time of her August, 1998 admission to Children’s nearly a year ago. I did not see on that record or recall at that time any evidence of head injury in [A. C.]. As I indicated, I have a medical condition that precludes my coming to court to testify.
The record also contains handwritten progress notes apparently constituting the record of the parents’ psychological evaluations. The writer’s name is illegible. The notes indicate the father was referred for psychological evaluation by his attorney in order to regain custody of A. C. The father said he was at work when his wife first brought the baby to the hospital for dehydration and vomiting. A CT scan the next day revealed a skull fracture. The baby was diagnosed with Shaken Baby Syndrome. He said his wife and her mother were taking care of the baby while he was at work.. Two months later, his wife brought the child for physical therapy and noticed a dent in the child’s head. The child was brought to Children’s where a “press skull fracture” was diagnosed and the hospital contacted Social Services. The notes reflect no history of physical abuse, chemical dependency or emotional illness in his family. The father was in good health and not on any medication. The doctor found no evidence of psychosis, thought disorder or major mood disorder. He suspected an adjustment in the mixed emotional features.
Similar progress notes for the child’s mother are in the record. She told the doctor she experienced bleeding when she was four months pregnant, which continued until the sixth month. She was placed on light bed rest because of the bleeding. The labor was induced. The mother gave the same history of the hospitalizations. She related feeling nervous, having a fluctuating appetite, frequent crying episodes and irritability. She denied having been physically or | ^sexually abused. She said she has been depressed and forgetful, and *679 is afraid to be home alone. The doctor found her to be in good health without addictive behaviors, evidence of psychosis, thought disorder or major mood disorder. He suspected adjustment disorder in the depressed mood, and suggested outpatient .follow-up.
Counsel for the child’s parents annexed to his brief a portion of Chapter 19 of Williams Obstetrics. The document was not offered, introduced or filed into evidence in the proceedings in the juvenile court and is not properly before this Court. The document has not been considered by this Court.
ANALYSIS
The purpose of Title VI of the Children’s Code, “Child in Need of Care,” is to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect or exploitation. Ch.C. art. 601. Title VI is intended to provide the “greatest possible protection as promptly as possible for such children; it shall be administered and interpreted to avoid unnecessary interference with family privacy and trauma to the child while, at the same time, to authorize the protective and preventive intervention needed to safeguard and enhance the health and well-being of children.” Id.
La.Ch.C. art. 606(A) provides in pertinent part:
“Allegations that a child is in need of care must assert one or more of the following grounds: (1) The child is a victim of abuse.... ”
The state shall have the burden to prove the allegations of the petition by a preponderance of evidence. La.Ch.C. art. 665; State In Interest of CW, RW, JW v. Womack, 28,310, p. 2 (La.App. 2 Cir. 2/28/96), 669 So.2d 700, 703. J^It is not the state’s duty to prove its case beyond a reasonable doubt, by clear and convincing evidence or to disprove every hypothesis of innocence.
Under the manifest error standard of review, in reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614.
We are instructed that before a fact-finder’s verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State, Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[2], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court’s verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
For the reasons set forth herein, we find the trial court was manifestly erroneous in its conclusions, and we note that even were we to apply the most tolerant of standards, abuse of discretion, the judgment below must be reversed.
Because of the deference owed to findings of trial courts under the manifest error standard of review, it is only rarely that the findings of fact issued by the trier |¡>4of fact will be disturbed. However, where, as here, critical findings are not supported by competent evidence, this Court has a duty to reconsider the actual evidence and render an appropriate judgment after having conducted a de novo *680 review of the evidence. See, Gonzales v. Xerox, 320 So.2d 163 (La.1975).
The trial court’s reasons for judgment provide an insight to the basic error below. The trial court concludes in the first paragraph that the delivering obstetrician “was forced to break [A/ C.]’s right clavicle” and that the child “had Erb’s Palsy, the result of the fracture to the right clavicle.” However, the birth record does not indicate the clavicle was broken and there is no testimony that says anything more than that it was possible that the clavicle was broken during delivery. In fact,, the testimony concerning X-rays taken immediately after the child’s birth does not confirm the notion of a broken clavicle. The Reasons ignore the child’s emergency room consultation with Dr. Sturgeon in July and the doctor’s note of no apparent fractures. Neither do the Reasons consider Dr. Duncan’s letter concerning her examination of the child on 12 August, and her concern that the child was failing to thrive.
The Reasons include the statement:
The Court was further advised that one or more of the above named treating physicians of {A. C.} at West Jefferson Hospital from the date of birth through her admission and discharge on August 16, 1998, have absconded and may have left the country.... {Their} departure casts a serious doubt as to what actually transpired at that hospital and further indicates to the Court that these injuries were not caused by the parents or grandparent. (Emphasis added.)
These are strong words indeed, for which there is no support in the record. This Court is left without any evidence of record as to who the “one or more” treating physicians were, or the nature of the extra-judicial communication to the | ¡.¿trial court that led the judge to believe that this “one or more” “absconded” and “may have” left the United States. Furthermore, there is no evidence supporting the trial court’s conclusion from the absence of these health care providers that it somehow logically follows that if they left the country, the parents and grandmother must not have caused the child’s injuries. That is quite simply a faulty syllogism. The absence of certain potentially helpful witnesses is not probative of the family’s guilt or innocence. There is no documentary or sworn evidence of record concerning the unavailability of these witnesses. Counsel for the child noted in argument, but not under oath, that when she went to West Jefferson Hospital to interview the mother’s obstetrician, Dr. Nicholson, and the head delivery room nurse, they were, in counsel’s characterization, “missing.” This is quite simply insufficient basis for the serious charge made against the West Jefferson personnel in the Reasons for Judgment.
The trial judge concludes that “it is evidence that something happened to this child while at West Jefferson Hospital ... which to this day, has not been brought to the Court’s attention.” The trial judge attributes all of the child’s injuries to this “something”. This finding, based on an absence of evidence rather than on any sworn testimony or documentary evidence, stands in stark contrast to the uncontro-verted testimony of the doctors who testified without contradiction that at the very least all the brain damage (which is, tragically, the most serious of the child’s many deficits) could not have been caused during delivery or during the August hospitalization at West Jefferson. There is no evidence of record that the child was brain damaged during delivery; indeed, it is inconceivable that a baby born with an AP-GAR score of nine on a scale of ten for the first test and nine on a scale of ten for the second test could have been so brain damaged.
|j.fiThe Reasons conclude that the child’s injuries were “the result of the injuries sustained by the child at birth leaving her in such a fragile condition.” Again, this conclusion is without evidentiary support. While the August skull fracture arguably could have made the bone softer, no one testified that this would result in the ex *681 traordinary injuries sustained by A. C. There is no medical evidence of a “fragility” that would have caused A. C.’s injuries.
This is not a case in which the trier of fact accepted one witness’s testimony over that of another. The expert testimony is unanimous as to the causation of the child’s most serious injuries, that being high velocity acceleration/deceleration characterized as Shaken Infant Syndrome together with grabbing, twisting injuries to the extremities and skeletal damage caused by beatings with a blunt object, characterized as Battered Infant Syndrome.
We are not persuaded by counsel for the parents’ selections in brief of out-of-context portions of the extensive trial testimony of Dr. Dessell and of Dr. Ward. Neither excerpt supports the trial court’s judgment. We have been instructed by the Louisiana supreme court that our review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the findings in the trial court, but we must consider whether the trial court findings are reasonable in light of the record taken as a whole. Ferrell, supra at p. 4-5, 650 So.2d at 742-43, citing Rosell v. ESCO, 549 So.2d 840 (La.1989). The court also noted, citing Rosell, that where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error even in a finding purportedly based upon a credibility determination. The Stobart opinion, according to the supreme court, was not |27intended to change these standards or to make the scope of appellate review of facts any more limited than described in Rosell and similar jurisprudence. Id.
The state offered uncontradicted proof of serious physical abuse during the time that the parents and grandmother had sole custody and control of this child. The parents and grandmother admitted that the child was not left with any alternative caregiver.
While the state’s standard of proof is merely preponderance of the evidence, we note that less weighty testimony has supported criminal convictions under the reasonable doubt standard. In State v. Bolden, 501 So.2d 942 (La.App. 2 Cir.1987), the court affirmed conviction of manslaughter, finding the victim died as a result of several violent intentional shakings causing diffuse swelling of the entire brain. The defense argued the injuries were caused by the victim’s own seizures or from unwitnessed accidents, such as the unwitnessed incidents alleged to have occurred at West Jefferson in the instant case. The court affirmed on the following testimony:
Medical testimony of both the admitting physician and the doctor who performed the autopsy revealed that the seizure experienced by the victim was caused by the brain injuries and that those injuries were not caused by the victim’s involuntary shaking during the seizure. Medical testimony also showed that the victim’s brain injuries were caused by the child being violently shaken and were not the result of any external head injuries, such as the victim’s head hitting a gas outlet, toilet, or floor. The doctors who examined the victim testified that had this occurred, some external bruise or injury would have been observable on the outside of the victim’s head and that no such injuries were present.
12SA. C. presented the same absence of external bruising. The parallel to A. C.’s condition is also evident in the court’s discussion of the evidence of Shaken Infant Syndrome adduced in Bolden:
The record further shows that the victim was shaken more than once shortly before admission to the hospital and that she had been shaken several weeks earlier. Evidence of old brain injuries from shaking were observed during the autopsy. These injuries were from six to *682 eight weeks old. Also, the record indicates that in the usual “Shaken Infant Syndrome” two areas of the brain would be injured. However, in this victim, the entire brain was injured, evidencing multiple shakings. Medical testimony showed that thee shakings which resulted in the fatal injuries occurred within three to four hours before the child was brought to the hospital.
Like the parents and grandmother in the instant case, Bolden stated to authorities that she had exclusive custody of the child during the forty-eight hours preceding hospital admission. The Second Circuit held that these facts led to the inescapable conclusion that the victim’s death was caused by Bolden’s unlawful behavior in violently and intentionally shaking the child on more than one occasion, shortly preceding her admission to the hospital. As in the instant case, no other reasonable hypothesis of innocence was found “in the evidence presented.” 501 So.2d at 946-47. See also, State v. Taylor, 31,860 (La.App. 2 Cir. 2/24/99), 733 So.2d 72 noting effects similar to those found in A. C. where victim suffered twelve to fourteen shaking incidents, and affirming the criminal conviction under the reasonable doubt standard.
The trial court’s reasons are overwhelmed by a perceived medical malpractice explanation for all of the child’s injuries. There was simply no proof adduced of medical malpractice in this case. Indeed, no expert testified that the procedures outlined in the child’s birth records were in any way inconsistent with | ¡.^accepted medical practice. The malpractice issue is for another court and another day. It is sufficient to note herein that the state sustained its burden of proving by a preponderance of the evidence that A. C. is a child in need of care, since her family member or members either caused her incapacitating injuries or failed to protect her from those who did so. The parents failed to introduce any competent evidence of record tending to show that an act or acts of malpractice by West Jefferson personnel or others caused or contributed to A. C.’s devastating injuries.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed and the child is found to be a child in need of care. Costs of the appeal are assessed against the appellees.
REVERSED AND RENDERED.

. Mr. North and Dr. Ward testified to 15 August admission; according to Dr. Benton, A. C. was admitted on 14 August.

. See, LSA-Const. Art. 5, section 10(B).