PEATROSS, J.
|3In this custody dispute, the trial court granted joint custody of two minor boys, J.B.A. and J.B.A., to their paternal and maternal grandparents, designating the Taylors, the paternal grandparents, primary domiciliary custodians with visitation in favor of the Fullers, the maternal grandparents. After careful review of the evidence and testimony in this case, we affirm the award of joint custody, but reverse the remainder of the judgment. Judgment is hereby rendered designating the Fullers as domiciliary custodians of *656 J.B.A. and with visitation in favor of the Taylors as specified herein.

FACTS AND ACTION OF THE TRIAL COURT

Nicole and Michael Alford had two sons, J.B.A. and J.B.A., ages four and one, when the two divorced. Thereafter, the boys lived primarily with Nicole, spending weekends with Michael. In November 1997, Nicole was killed in a car accident. At the time, Michael was living with a girlfriend, Erin. For approximately one year after Nicole’s death, the boys resided with their father. Apparently, Michael and Erin began fighting and the environment in that home was not appropriate for the young boys. The boys, therefore, moved in with Michael’s parents, the Tay-lors. During this time, the boys spent most weekends with the maternal grandparents, the Fullers. For several years, the two sets of grandparents had substantial time with the boys and were somewhat cooperative with each other regarding time with the boys.
In July 2001, Michael filed a Petition for Voluntary Transfer of Custody to his mother, Mrs. Taylor, for an undesignated period of time. An |4order granting Mrs. Taylor sole custody of the boys was signed on July 3, 2001. No appeal was taken and no objection was made to the order.
Soon thereafter, discord erupted between the two sets of grandparents. All parties agree that there was some type of confrontation between Mrs. Taylor and Mrs. Fuller concerning Mrs. Fuller’s desire to take one of the boys to church. The various accounts of this incident all confirm one common thread. — since the encounter, there has existed a tension between the grandmothers concerning the activities of the boys and when the boys will be allowed to spend time and associate with the Fullers. In addition, prior to this encounter, the Fullers were enjoying spending most weekends with the boys, could visit the boys’ school and attended ball practices and games. After the encounter, the Taylors unilaterally restricted the Fullers’ time with the boys to alternating weekends, spoke with the school authorities to disallow Mrs. Fuller from visiting the boys’ school and made the boys feel uncomfortable about associating with the Fullers at ball practices and games. Mrs. Taylor does not dispute these facts.
This deteriorating relationship between the grandparents prompted the Fullers to file a Petition for Modification in November 2001, requesting sole custody of the boys, with reasonable supervised visitation of Michael. The Fullers alleged that the Taylors neglected and abused the boys, physically and emotionally, and that the children would suffer substantial harm if returned to the custody of their father. The court appointed a psychologist, Dr. Gary Baker, to conduct mental health evaluations of all of the parties and present a report and opinion on custody to the court. In |saddition, the Fullers hired Lynne Thomas, a licensed counselor, to evaluate the boys and render an expert opinion on what living arrangement would be best for them.
The hearing in this matter was continued many times, mainly due to the failure to complete the mental health evaluations. The continuances resulted in an inordinate delay in the matter coming before the trial court for decision.[1] The matter was finally *657 heard in October 2004 and, by interim order on June 13, 2005, joint custody was awarded to the Taylors and Fullers, with the Taylors named as primary domiciliary custodians and the Fullers being granted specific visitation rights. This appeal by the Fullers ensued.

DISCUSSION

The paramount consideration in any determination of child custody is the best interest of the child. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731; Hoskins v. Hoskins, 36,031 (La.App.2d Cir.4/5/02), 814 So.2d 773; Masters v. Masters, 33,438 (La.App.2d Cir.4/5/00), 756 So.2d 1196, writ denied, 01-3096 (La.12/7/01), 803 So.2d 975. La. C.C. art. 134 provides a non-exclusive list of factors which the trial court |fimay consider with all other relevant factors for the determination of the best interests of the child.[2] The consideration of all relevant factors under Article 134 should be followed in actions to change custody, as well as in those to fix custody initially. The court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of those factors. The court is not bound to give more weight to one factor over another; and, when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. Hos-kins, supra. Moreover, the factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. Id.
We note that deference is due the trial court in custody determinations involving factual issues. Under the mani *658 fest error standard of review, in 17reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. State ex rel. W.H. v. J.A., 35,887 (La.App.2d Cir.2/27/02), 811 So.2d 189, citing Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), 666 So.2d 612. We are instructed that, before a fact finder’s verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict and that the record establishes that the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
Although we accord deference to the fact finder, we are cognizant of our constitutional duty to review facts, not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court’s verdict was manifestly erroneous/clearly wrong based on the evidence or clearly without evidentiary support. See LSA-Const. Art. 5, section 10(B); Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216. A review of facts is not completed by reading only so much of the record as will reveal a reasonable factual basis for the findings in the trial court, but the reviewing court must consider whether the trial court’s findings are reasonable in light of the record taken as a whole. State ex rel. A.C., 99-1943 (La.App. 4th Cir.2/23/00), 772 So.2d 668, writ denied, 00-1231 (La.5/10/00), 761 So.2d 554.
| sAfter a very thorough review of the entire record in the case sub judice, we find that the trial court was manifestly erroneous in its conclusions. Again, we are mindful of the deference owed to findings of trial courts under the manifest error standard of review; however, where, as here, critical findings are not supported by competent evidence, this court has a duty to reconsider the actual evidence and render an appropriate judgment after having conducted a de novo review of the evidence. State ex rel. W.H. v. J.A., supra; State ex. rel. A.C., supra, citing Gonzales v. Xerox, Corp., 320 So.2d 163 (La.1975).
First, we find that the judgment of the trial court regarding primary domiciliary custodial status is not supported by the evidence. While it is a fact that the boys have primarily resided with the Tay-lors for the period of time prior to the hearing and judgment in this matter, we find no evidence in the record that suggests that any factor weighs in favor of the Taylors as primary custodians other than Mrs. Taylor’s desire that the present physical custody situation continue. To the contrary, the overwhelming evidence favors the Fullers as primary custodians.
The Taylors admitted in their testimony that there have been somewhat violent altercations at their home, some involving the boys’ father. There was no dispute that profanity is used in the Taylors’ home and that both boys use profanity with disregard. There was conflicting testimony on the use of alcohol, but Mr. Taylor has failed at least one drug screen (testing positive for cocaine) prior to the hearing in this matter. Ms. Thomas testified that there was inappropriate punishment occurring at the |flTaylor household, including the boys’ belief that they were locked in rooms and/or closets for punishment. In both experts’ opinions, a critical factor in this case involves the custodian’s willingness and ability to foster a good relationship with the other custodians. There was testimony that the Taylors inhibited the relationship between the Fullers and the boys by making the boys feel as if they *659 could' not visit with the Fullers at ball practices and games. Mrs. Taylor restricted the boys’ time with the Fullers from virtually every weekend to every other weekend and prohibited Mrs. Fuller from visiting the school. Most telling in this regard was the boys’ fear of reprisal for truthfully expressing their desire to live with the Fullers rather than the Tay-lors.
On the other hand, there was no‘dispute that there is no profanity, use of alcohol or smoking in the Fullers’ home. The Fullers attend church and, when the boys are with them, the boys attend church and Sunday school. The Taylors suggest that there are no rules at the Fullers and that the boys’ time with the Fullers is all “fun and games” with no set bed time, etc. Both Mr. and Mrs. Fuller testified that, since they have the boys very seldom and it is on the weekends, they do not enforce a strict bed time. They each testified, however, that their home is a structured environment; and, if the boys lived with them during the week, there would be rules to be followed, including a set bed time.
In its reasons for judgment, the trial court cited the Article 134 factors and stated repeatedly that the boys seemed to be “well-adjusted.” The court recognized both boys’ stated preference to live with the Fullers, noting that|inhe found them to be “fine young men” who were “fairly well-adjusted.” While stating that both sets of grandparents seemed able to love and care for the boys, the court admonished the Taylors for allowing profanity to be spoken around the children and he acknowledged the grandmothers’ animosity toward one another. Interestingly, the court did not comment on either of the experts’ testimony, but seemed to be guided by the fact that the boys had resided primarily in the Taylors’ home for an extended period of time. While we remain cognizant that the trial court is not bound to follow the opinion of any one expert or lay witness, including the- one chosen by the court to evaluate the parties, we are struck by the disregard of the unrebutted testimony by both experts, the Fullers, fellow church members of the Fullers and both boys themselves that it would be in the best interest of the boys to reside primarily in the Fullers’ home.
We find significant the fact that the boys were brave enough and had the strength of character at their young ages to express their desire to live with the Fullers. The boys unequivocally stated this desire to Ms. Thomas and Dr. Baker, as well as to the trial judge. Most significantly, the boys consistently stated this preference (to Ms. Thomas) over a period of years. The boys made their desire known despite the perceived fear that Ms. Taylor would be angry and may “get them in trouble” for saying that they would rather live primarily with the Fullers than with her. Recognizing that the preference of the child is only one of many factors to be considered and considering the relatively young ages of the boys, we now turn to the testimony of the experts.
lnRecall that Ms. Thomas, a licensed clinical social worker and expert in custody, child abuse, child development and social work, evaluated the boys and testified on behalf of the Fullers. Ms. Thomas has vast experience in counseling children in similar cases and has been qualified and testified as an expert in this field in hundreds of cases. In this matter, she interviewed the boys five times over a period of approximately two years. At the first round of interviews in July 2001, the boys were ages seven and five. According to Ms. Thomas, both boys related that Mrs. Taylor spanked them (with her hand or with a utensil such as a flyswatter) and *660 locked them in their rooms or closets for punishment. She testified that the younger boy told her that Mrs. Taylor pushed him under the water during his bath. Both boys related to Ms. Thomas that Mrs. Taylor used curse words frequently, that the Taylors talked badly about the Fullers and that it was Ms. Thomas’ opinion that there had been negative consequences to the boys from Mrs. Taylor when they had showed affection to the Fullers. Specifically, Ms. Thomas testified that, when one of the boys asked to go to the Fullers’ house, Mrs. Taylor responded “I’m not letting you go to those idiots’ house.”
In addition, Ms. Thomas testified that she had to reassure the boys repeatedly that their comments would not be shared with Mrs. Taylor because the boys were afraid of Mrs. Taylor’s reaction. After her assurances to them that their comments would not be shared, both boys told Ms. Thomas that they would rather live with the Fullers than the Taylors, hgbut would like to visit Mrs. Taylor. Ms. Thomas was firm in her opinion that the boys did not appear to have been coached in any way.
During the second round of interviews, the boys’ comments to Ms. Thomas were consistent with the first interviews regarding the profanity used at the Taylors and the punishments inflicted. The boys maintained their desire to live with the Fullers. The third round of interviews took place in March 2002, at which time one of the boys told Ms. Thomas that they had not been allowed to see the Fullers in a while. The older boy also told Ms. Thomas that Mrs. Fuller had tried to visit them at school, but that Mrs. Taylor would not let Mrs. Fuller come to school anymore. Apparently, this interview occurred after the confrontation over the church issue between Mrs. Taylor and Mrs. Fuller because the younger boy told Ms. Thomas that Mrs. Taylor had “cussed” Mrs. Fuller. Both boys again told Ms. Thomas that they wanted to live with the Fullers.
The final round of interviews took place in September 2003. Both boys again told Ms. Thomas that they wanted to live with the Fullers and only visit with the Taylors. The boys’ description of being “whupped” was consistent from the year before and, just as before, the boys felt as if they could not speak to the Fullers when they were in public because it would anger Mrs. Taylor. The boys also continued to use profanity in their normal speech and told Ms. Thomas that the Taylors “cuss” a lot. Ms. Thomas testified that it was her opinion that, if the relationship between the boys and the Fullers was continually thwarted by the Taylors, the relationship would simply dissolve with the boys taking the “path of least resistance.” Ms. | ^Thomas explained that, in her opinion, it was crucial for these boys to have loving relationships with each set of grandparents, especially in light of having lost their mother and having a less than desirable relationship with the father.[3]
Ms. Thomas explained that she questioned the boys about what was good in their lives and what was not good. According to Ms. Thomas, the boys consistently associated good things with the Fullers’ home and activities that occurred there and the bad things with the Taylors. For example, one of the boys stated that “what is bad” is that Mrs. Taylor “is mean.” It was Ms. Thomas’ opinion that the boys loved the Taylors, but were afraid *661 of Mrs. Taylor. She opined that the boys should have frequent contact with the Tay-lors, but that it would be in their best interest to live primarily with the Fullers.
Dr. Baker testified as the court-appointed expert psychologist whose task it was to make a recommendation on the appropriate placement of the boys. Dr. Baker interviewed each of the parties and the boys and prepared a report in which he concluded that “the better placement would be for the boys to be with the Fullers and to ... but have substantial time with the Taylors.” Dr. Baker based his opinion in part on the results of his psychological evaluations of Mrs. Fuller and Mrs. Taylor. Dr. Baker testified that Mrs. Fuller seems to be the more stable individual. Her depression from losing her daughter was in remission and was being managed very well with medication and did not present any impediment to her parenting ability with regard to the boys. There were no significant findings concerning Mrs. Fuller’s psychological evaluation. Mrs. Taylor’s evaluation, on the other hand, indicated that she may have difficulty interpreting others’ intentions and there was some instability in that regard that may be contributing to the turmoil surrounding the boys’ visitation with the Fullers. Dr. Baker opined that the situation may be more stable if the Fullers had more control over the visitation.
Dr. Baker administered various personality evaluations to each of the parties, including the boys’ uncle, Doc, Nicole’s brother, who spends a great deal of time with the boys when they are with the Fullers. Dr. Baker had no concerns of Mr. Fuller’s capabilities with the boys and observed them together for almost an hour. Dr. Baker concluded that Mr. Fuller acted very appropriately and effectively with the boys. Dr. Baker testified that Mr. Fuller likes well-structured situations which would be good for the younger boy who was diagnosed with ADHD - and requires a more stable and structured environment with positive orientation.
Dr. Baker’s evaluation of Doc revealed that he is above-average intelligence and very capable of caring for the boys. Dr. Baker opined that he observed a very strong ■ bond between the boys and Doc and that Doc was very capable of handling situations with the boys and was an important part of the boys’ lives.
Mr. Taylor’s psychological evaluations revealed that he is in a “chronic state of stimulus overload,” meaning that he is under constant | ustress. While he is a positive, extroverted individual, he tends to manifest stress as physical symptoms and is prone to anxiety, nervousness and irritability. Dr. Baker opined that Mr. Taylor is “unlikely to be very tolerant of frustration.”
Regarding Mrs. Taylor, Dr. Baker noted that, because of her attendance in school through only the 9th grade, she may have difficulties in helping the boys with homework when they enter' high school. He noted that, on the personality evaluations, Mrs. Taylor exhibited several elevated scales. He testified that “the defensiveness scale and the lie scale and the superlative self-presentation scales were all three quite elevated. So that any ... any problems that a person has, when they’re trying to appear that good, are certainly not going to be well-defined.” Other tests indicated that Mrs. Taylor ’sees herself in a very positive light, she has “inflated self-esteem” and tends to be “somewhat grandiose.” Dr. Baker opined that Mrs. Taylor “lacks a well-defined and consistent coping style,” meaning that one is never sure how she will approach any given situation. Further, she has limited social skills which may limit her ability to manage social rela *662 tionships, including family. Dr. Baker was concerned about the use of profanity in the Taylor household and the effect it may have on the boys in their peer groups should they continue to use the language themselves.
Dr. Baker interviewed the boys on two occasions and the boys consistently told him that they would prefer to live with the Fullers. Further, he was firm in his opinion that there had been no “brainwashing” or coaching by anyone regarding what the boys related to him. Like Ms. |1FiThomas, Dr. Baker testified that the boys believed that Mrs. Taylor would get mad if she knew that they had expressed their desire to live with the Fullers. As previously stated, Dr. Baker’s conclusion and recommendation was that the boys live primarily with the Fullers, but have substantial contact with the Taylors.
In summary, we conclude that it is appropriate for the Taylors and Fullers to share joint custody of the boys. We further find, however, that the record does not reasonably support the trial court’s conclusion that the Taylors be designated the primary domiciliary custodians. As such, we have reviewed the record de novo and concluded that the overwhelming evidence, including the desire of the boys and the opinion of both experts, dictates that it is in the best interest of J.B.A. and J.B.A. that they live primarily with the Fullers, with substantial and continuing contact with the Taylors. Accordingly, the joint custody arrangement remains in effect, with the Fullers being designated the primarily domiciliary custodians. The specific periods of visitation previously awarded the Fullers in the trial court’s judgment will now hereby be in favor of the Taylors.

DECREE

For the foregoing reasons, the judgment of the trial court awarding joint custody of J.B.A. and J.B.A. to the Taylors and Fullers is affirmed. The designation of the Taylors as primary domiciliary custodians is reversed and such status is hereby awarded to the Fullers. The Taylors are hereby awarded visitation as specified in the trial court’s judgment (originally in favor of the Fullers). Costs of appeal are to be paid by the Taylors.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.

. Several of the continuances were made jointly by the parties in an attempt to have the Taylors complete follow-up or supplemental mental health evaluations by Dr. Baker. In addition, the record indicates that the Fullers may have had some issues with their counsel. In any event, such protracted litigation in *657 sensitive custody cases is not in the best interest of the children.
Regarding the supplemental evaluations by Dr. Baker, we note that the Fullers and the boys participated in follow-up evaluations with Dr. Baker prior to the hearing in this matter. The supplemental evaluations of the Taylors, however, never took place. The Tay-lors submit that they were unable to pay for the supplemental evaluations with Dr. Baker; however, Dr. Baker testified that his office made several attempts to contact the Taylors to schedule and/or discuss the follow-up evaluations, but the calls were never returned. The Taylors made no attempt to contact Dr. Baker's office and did not inquire as to any possible financial arrangements that would make the follow-up evaluations possible.

. La. C.C. art. 134, comment (d). La. C.C. art. 134 provides: The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to'continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. The boys' father, Michael, also testified at the hearing. He maintained the belief that the boys would be better off living with someone other than himself, preferably his mother. He did not seek any order of visitation and was not interested in regaining physical custody of the boys at that time.