MAKAR, J.
The Department of Highway Safety and Motor Vehicles seeks review of a circuit court order overturning a hearing officer’s administrative order, which had upheld the suspension of Joseph P. Wiggins’s driver’s license. The narrow but important issue presented is whether the circuit court, acting in its appellate capacity, erred by concluding that its independent review and assessment of events on a video of the traffic stop trumped the hearing officer’s factual findings, which were based on the arresting officer’s testimony and report. We hold that it did and grant the petition for certiorari.
I.
In August 2011, Deputy J.C. Saunders initiated a traffic stop of Mr. Wiggins, who was driving his pickup truck down Bland-ing Boulevard, a main thoroughfare in Clay County, Florida. A camera mounted on the dashboard of the deputy’s vehicle recorded the movement of Mr. Wiggins’s vehicle from the time the deputy first observed it, while Mr. Wiggins pulled into a gas station parking lot, and for approximately twelve minutes thereafter.
During the stop, Deputy Saunders requested that Mr. Wiggins perform a field sobriety test, but he declined. Deputy Saunders then arrested Mr. Wiggins for DUI and transported him to the county *460 jail where, again, Mr. Wiggins declined to submit to a sobriety test. Due to these refusals, the Department placed an administrative suspension on Mr. Wiggins’s driver’s license.
Mr. Wiggins requested a formal review hearing to demonstrate that probable cause did not exist for the stop of his vehicle. Deputy Saunders and Robert Burch, the breath test operator, testified at the hearing and the arrest and booking report was admitted in evidence. The video of the stop was entered in evidence and was a focus of a portion of the proceeding, which consisted primarily of Mr. Wiggins’s attorney examining Deputy Saunders. Throughout the examination, Deputy Sanders testified while referring to the video. The hearing officer controlled and played the DVD player, starting and stopping the video player as necessary to view the portions related to the deputy’s testimony. During this examination, counsel for Mr. Wiggins only once specifically asked Deputy Saunders whether his written report was consistent with what appeared on the video. The deputy confirmed that his entire report as written was supported by the video, pointing out where the vehicle’s movement and pattern corresponded to what he said in his report with a few limited exceptions. One was that when he first saw Mr. Wiggins’s vehicle and became suspicious about its driving pattern, the vehicle was within his eyesight but beyond the capabilities of the camera to capture (“the video doesn’t always show everything I can see as far as at a distance”). Another was when Deputy Saunders voluntarily pointed out (before counsel asked him to do so) that his report erred in one respect by saying that his police cruiser at one point changed lanes first when it was Mr. Wiggins’s vehicle that did so. The final was when Deputy Saunders thought Mr. Wiggins put his hands on his truck as he exited to maintain balance, which Mr. Wiggins’s counsel noted did not actually happen.
Based upon the testimony and evidentia-ry record that included the video, the hearing officer made the following findings of fact:
On August 19, 2011, at approximately 2:10 a.m. Deputy J.C. Saunders of the Clay County Sheriffs Office observed a vehicle swerving within the lane, almost striking the right side curb on several occasions, and then braking erratically for no apparent reason. He also paced the vehicle and determined that it was traveling 30 MPH in a 45-MPH zone. Suspecting that the driver might be impaired, Deputy Saunders conducted a traffic stop. Deputy Saunders observed the driver, Mr. Joseph Bryant Wiggins, Sr., to have an extremely strong odor of an alcoholic beverage coming from his breath, bloodshot, glássy eyes, a flushed face, and his movements were slow and deliberate. Mr. Wiggins admitted to consuming a few drinks when asked about his alcohol consumption: Mr. Wiggins refused to submit to field sobriety exercises and was placed under arrest for DUI. Based on the foregoing, I find that the petitioner was placed under lawful arrest for DUI. At the Clay County Jail, the implied consent warning was read and Mr. Wiggins refused to submit to the breath test.
Based on these factual findings, the hearing officer held that probable cause existed to believe that Mr. Wiggins was driving under the influence; that Mr. Wiggins refused to submit to a urine, blood, or breath-alcohol test after being requested to do so; and that Mr. Wiggins was told that his refusal to submit to a sobriety test would result in suspension of his license. The administrative order thereby affirmed the suspension of Mr. Wiggins’s driver’s license.
*461 Mr. Wiggins then filed a petition for certiorari in circuit court, seeking review of the hearing officer’s order, claiming it departed from the essential requirements of law and was not supported by competent substantial evidence. Specifically, he argued that the arrest and booking report statements directly conflicted with events on the video of the traffic stop. The circuit court, after independently reviewing the video, held that the administrative order was flawed because the video contradicted portions of the officer’s testimony and report.
In- reaching this conclusion, the trial court compared and contrasted some — but not all — of the information in the arrest/booking report with events on the video. For example, the report stated that “the vehicle was drifting and weaving in its own lane traveling at 30 mph in a 45 mph zone, the passenger side tires crossed over the fog line and nearly struck the raised curb before swerving back into the lane.” The court disagreed with this characterization, finding that the “video clearly refutes this evidence; in the video the vehicle does not drift and weave within its own lane. Furthermore, the passenger side tires do no not cross over the fog line nor do they come close to striking the raised curb.” The report also claimed that “after coming to flashing yellow lights at the intersection ... [Mr. Wiggins] braked for no reason and then accelerate [sic].” Contrarily, the trial court found that the video showed Mr. Wiggins “did brake slightly when coming to the flashing yellow lights” but that he slowly accelerated after passing the lights, compared to the report, which stated he “braked for no reason and then accelerated.” The court acknowledged that Mr. Wiggins momentarily braked, but disagreed that Mr. Wiggins swerved to the right and almost hit the curb as he passed through an intersection. Finally, the report claimed that Mr. Wiggins “drifted into a turn lane” and “[w]hile making a wide left turn he had to realign his truck as he straightened out.” Disagreeing once again, the trial court reviewed the video and concluded that Mr. Wiggins deliberately changed lanes and the turn into the intersection was normal.
The trial court conceded that Deputy Saunders’s testimony coupled with the report supported the factual findings of the hearing officer. Nonetheless, it held that “this testimonial evidence is flatly contradict [sic] by- the objective evidence on the videotape.” It concluded that in “[viewing the entire record evidence, neither the testimony of Deputy Saunders nor the arrest and booking report constitutes competent substantial evidence on which the hearing officer could rely.” Acknowledging that it could not reweigh the evidence or substitute its judgment for that of the hearing officer, it supported its approach by relying on Julian v. Julian, 188 So.2d 896 (Fla. 2d DCA 1966), for the proposition that “where the evidence is objective and there is not a determination of credibility, the reviewing court is in the exact same position as the hearing officer.” Apparently believing it was “in the exact same position as the hearing officer” as to the evidence, the trial court concluded that it “was unreasonable as a matter of law for the hearing officer to accept Deputy Saunders [sic] report and testimony after this evidence was shown to be erroneous and flatly contradicted by the objective images of the videotape.” As a result, the trial court’s order overturned the hearing officer’s order and the administrative suspension of Mr. Wiggins’s driver’s license, as well.
II.
Review of the circuit court’s order entails second tier certiorari review, by which two limited questions are posed: *462 whether the circuit court afforded procedural due process and applied the correct law. Haines City Cmty. Dev. v. Heggs, 658 So.2d 523, 530 (Fla.1995); Dep’t of High. Saf. & Motor Veh. v. Trimble, 821 So.2d 1084, 1086 (Fla. 1st DCA 2002). This level of review is narrower than a circuit court’s first tier certiorari review, which reviews an administrative agency’s decision for three components: (1) whether procedural due process was accorded, (2) whether the essential requirements of law were observed, and (3) whether the factual findings are supported by competent substantial evidence. Educ. Dev. Ctr., Inc. v. City of W. Palm Beach Zoning Bd. of Appeals, 541 So.2d 106, 108 (Fla.1989).
At issue in this case is only whether the circuit court applied the correct law. The Department argues it did not, pointing out that the trial court’s only job was to determine whether the hearing officer’s findings of fact were supported by competent substantial evidence as announced in Dusseau v. Metropolitan Dade County Board of County Commissioners, 794 So.2d 1270, 1275-76 (Fla.2001) and prior similar precedents. By conducting what amounted to a de novo review of the evidence and imper-missibly reweighing of it, the circuit court departed from the well-established legal principle that it was without authority to do so. Mr. Wiggins counters that the deputy’s testimony and report upon which the hearing officer relied was not competent substantial evidence in light of the video. He argues that the trial court was entitled to conclude that the video objectively demonstrated that the report and the deputy’s testimony were erroneous and thereby not competent substantial evidence; he asserts the trial court’s methodology was not prohibited under any clearly established caselaw, including Dusseau, to which we now turn.
A. Dusseau as Clearly Established Law
Whether Dusseau is clearly established law applicable in this case requires an examination of what rule of law our supreme court established or reaffirmed.[1] In Dusseau, a Baptist congregation owned acreage in Miami-Dade County upon which it sought to build a large church. Over the objections of a nearby homeowner, the county commission approved the application after holding an evidentiary hearing on the matter at which evidence from both sides of the disputed matter was presented. 794 So.2d at 1272. In its appellate capacity, the circuit court — after reviewing all the evidence submitted by both sides — reversed, finding no competent substantial evidence that the proposed church construction met the requisite criteria for a special exception; to the contrary, the circuit court held that competent substantial evidence existed showing the church did not meet requisite criteria. Id.
On second tier certiorari review, the Third District made two rulings. First, it held that the “circuit court departed from the essential requirements of law when it reweighed evidence and completely ignored evidence that supports the Commission’s ruling.” Id. at 1275. Second, it said that its own “review of the evidence clearly demonstrates that the Commission’s ruling was supported by competent substantial evidence[.]” Id.
The supreme court, after reviewing principles of first and second tier certiorari, upheld the district court’s first ruling but reversed its second (the latter because it is not a district court’s job to review the *463 record and make its own merits ruling). As to the first ruling, the supreme court affirmed as “proper” the district court’s conclusion that the trial court “departed from the essential requirements of law when it reweighed evidence and completely ignored evidence” supporting the Commission’s ruling. Id. Setting the tone that nomenclature does not matter, it began by noting that “[a]lthough the circuit court phrased its reversal in terms of ‘competent substantial evidence,’ the plain language of its order shows that the court in fact reweighed the evidence, at length.” Id. It is not the label a circuit court uses to describe its analysis that matters; instead, it is whether the circuit court applied the established and limited methodology of looking only for whether competent substantial evidence existed in support of the challenged administrative decision. The supreme court described the circuit court’s erroneous approach as follows:
Instead of simply reviewing the Commission’s decision to determine whether it was supported by competent substantial evidence, the court also reviewed the decision to determine whether it was opposed by competent substantial evidence. The circuit court then substituted its judgment for that of the Commission as to the relative weight of the conflicting evidence. The circuit court thus usurped the fact-finding authority of the agency.
Id. Given the circuit court’s improper approach to evaluating the record evidence, the supreme court sided with the district court, holding that it was a departure from the essential requirements of law — and an application of the “wrong law” — for the circuit court to review and reweigh the evidence, essentially deciding “anew the merits” of the case. Id. As the supreme court explained, the circuit court applied the “wrong law” by engaging in the type of evidence review/fact-finding that is to be done by an agency or administrative hearing officer (the so-called Irvine[2] standard); instead, the circuit court was to engage in the far more limited approach on first tier review, which is a search of the record for the existence of competent substantial evidence in support of the decision.
This clearly established legal principle in Dusseau — that a circuit court applies the “wrong” or “incorrect” law when it reweighs or reevaluates conflicting evidence and decides the merits of the underlying dispute anew — was previously well-established. As the supreme court pointed out in Dusseau, its previous precedents had announced such a rule. See 794 So.2d at 1273-75 (discussing Florida Power & Light Co. v. City of Dania, 761 So.2d 1089 (Fla.2000) and City of Deerfield Beach v. Vaillant, 419 So.2d 624 (Fla.1982)). Indeed, the court explained as follows:
Under Vaillant, the district court was required to determine whether the circuit court applied the correct law. As noted above, according to the plain language of its order, the circuit court reweighed the evidence and decided anew the merits of the special exception application. The circuit court thus applied the wrong law (i.e., instead of applying the Vaillant standard of review, the court reapplied the Irvine standard of proof), and this is tantamount to departing from the essential requirements of law (as the district court ruled).
794 So.2d at 1275 (quoting Florida Power & Light, 761 So.2d at 1093) (emphasis added)). In light of the many commanding *464 precedents on this point of law, this Court cited Dusseau for the following statement:
[0]ne ‘clearly established principle of law is that, on first-tier certiorari review, a circuit court is limited to determining whether the administrative findings and judgment are supported by competent substantial evidence. Whether the record also contains competent substantial evidence that would support some other result is irrelevant.
Clay Cnty. v. Kendale Land Dev., Inc., 969 So.2d 1177, 1181 (Fla. 1st DCA 2007). We now turn to whether the circuit court’s approach in this case conformed to these clearly-established principles in Dusseau and like precedents.
B. Applying Dusseau to This Case
As Dusseau explained, a circuit court is only permitted to determine whether an agency’s decision was supported by competent substantial evidence. 794 So.2d at 1275 (“the court should review the record to determine simply whether the Commission’s decision is supported by competent substantial evidence.”). Stated differently, this limited review boils down to a single-focused inquiry:
The sole issue before the court on first-tier certiorari review is whether the agency’s decision is lawful. The court’s task vis-a-vis the third prong of Vaillant is simple: The court must review the record to assess the evidentiary support for the agency’s decision. Evidence contrary to the agency’s decision is outside the scope of the inquiry at this point, for the reviewing court above all cannot reweigh the “pros and cons” of conflicting evidence. While contrary evidence may be relevant to the wisdom of the decision, it is irrelevant to the lawfulness of the decision. As long as the record contains competent substantial evidence to support the agency’s decision, the decision is presumed lawful and the court’s job is ended.
Id. at 1276 (emphasis added). The emphasized language — as applied to this case— shows how the circuit court went beyond the specific analytical parameters of Dus-seau and its progeny, thereby applying the incorrect law.
The circuit court — in reaching its ultimate legal judgment — focused exclusively on the video, which both Wiggins and the court deemed to be “evidence contrary to the agency’s decision.” That was error. The sole starting (and ending) point is a search of the record for competent substantial evidence supporting the decision. The proper approach is narrow here, focusing on whether the officer’s testimony, the arresting/booking report, or the video — or portions thereof— support the hearing officer’s factual findings. See City of Jacksonville Beach v. Car Spa, Inc., 772 So.2d 680, 631-32 (Fla. 1st DCA 2000) (“[I]t is clear that ... rather than reviewing the entire record to determine whether the Planning Commission’s decision was supported by competent substantial evidence, the circuit court considered only portions of the record, and reweighed the evidence, substituting its judgment for that of the Planning Commission as to the relative weight of that evidence.”). The existence of inconsistencies or contradictions in the overall evidentiary record does not negate a hearing officer’s findings; an evidentiary record need not have one-sided purity to prevail. Id. Besides that, putting contrary evidence on the judicial scales is “outside the scope of the inquiry” at the circuit court level and amounts to a pros/ cons approach that Dusseau prohibits.
Within its analysis, the trial court tacitly conducted the type of review envisioned by Dusseau because it explicitly said that “[standing alone, the arrest and booking report and the testimony by Deputy Sand *465 er would support the findings of the hearing officer.” Its inquiry at that point — as explained in Dusseau — was thereby “ended.” 794 So.2d at 1276. Whatever misgivings it may have had about possible conflicts between the video and the officer’s testimony/report were “outside the scope of the inquiry” as Dusseau holds. If portions of the report, or portions of the officer’s testimony, or portions of the video, or some combination of the three, provided evidentiary support for the hearing officer’s findings, judicial labor was at its end.
Beyond the clarity of Dusseau and its progeny on this legal point, good policy reasons support the narrowing of the scope of certiorari review of administrative factual findings. One is that appellate litigants are not entitled to duplicative plenary review of factual findings as the appellate ladder is traversed. Instead, litigants get one opportunity to make an evi-dentiary record and to persuade the fact-finder to one of their competing views of the evidence; they cannot appeal to a circuit court and obtain such detailed review again. In this regard, it is noteworthy that the circuit court conducted — in large part — essentially the same type of review done by the hearing officer (with several important limitations discussed below). By comparing the video to the officer’s report, and making judgments about whether they were sufficiently in lockstep with each other, the circuit court repeated almost the exact same exercise that the hearing officer had already performed in the hearing room. But circuit courts are not to do so; doing so would impermissibly provide the “second bite at the apple” that first tier certiorari review precludes.
A second policy point is one of deference to the administrative hearing officer, who heard the live testimony, saw the video firsthand interactively with the officer’s testimony, and is experienced on licensure suspension matters. The supreme court made this point in Dusseau, reiterating that “the ‘competent substantial evidence’ standard cannot be used by a reviewing court as a mechanism for exerting covert control over the policy determinations and factual findings of the local agency.” Dusseau, 794 So.2d at 1275-76 (emphasis added). Instead, the “standard requires the reviewing court to defer to the agency’s superior technical expertise and special vantage point in such matters.” Id. at 1276 (emphasis added). The two highlighted passages underscore that a primary principle of Dusseau is first tier deference to (rather than “control over”) administrative factual findings because of the hearing officer’s “special vantage point” in the process; Dusseau cannot be dismissed as merely an “agency expertise” case.
For like reasons, important limitations undercut the circuit court’s re-review of the evidentiary record. As just mentioned, the hearing officer heard firsthand from the officer, who was questioned about and explained alleged inconsistencies between the video and the report; the circuit court had no contextual explanation upon which to rely other than the transcript of the officer’s testimony, which eoncededly supports the hearing officer’s findings. Unlike the circuit court, the hearing officer could evaluate the credibility of the officer and make a determination, for example, that he was truthful in his explanation of what he saw, and what his report said, regarding the vehicle’s driving pattern.[3] *466 While the video alone might appear as thin evidence for the stop, when viewed in conjunction with the officer’s testimony, if believed, the evidence as a whole explains why the officer was led to believe the vehicle’s driver might be impaired (impairment being a multi-factored judgment call). For this reason, the circuit court’s belief that the “hearing officer was in no better position to evaluate the probative value of [the video] than is this Court” was mistaken; the hearing officer was in a far better position to evaluate the overall evidence, the “special vantage point” emphasized in Dusseau.
Another limitation is that the circuit court concluded that the video nullified the officer’s testimony and the report in their entirety. This too was mistaken. By concluding it “was unreasonable as a matter of law for the hearing officer to accept Deputy Sanders report and testimony” in their entirety, the circuit court failed to follow Dusseau, which requires culling through the record for whatever bits and pieces of evidence that support an administrative order’s factual findings. Here, that meant separating out those portions of the officer’s testimony, his report and the video itself that are supportive of the hearing officer’s findings, leaving contrary or inconsistent evidence on the cutting room floor. Viewed in this light, the video— consistent with relevant portions of the testimony and report — shows the vehicle appeared to weave somewhat, slowed to 30 mph in a 45 mph zone, and braked within an intersection for no apparent reason — all at 2:10 am. The officer also testified that his initial observation of the vehicle’s driving pattern, from a distance the video was unable to capture fully, caught his attention by appearing to swerve and flash its taillights in an odd way. This evidence, which the circuit court otherwise deemed competent and substantial, cannot be ignored simply because the circuit court disagreed with portions of testimony and report that it deemed conflicted with the video.
A final, but related, policy point is that circuit courts are required to put aside their factual correctness meters, as difficult as that may be. As the supreme court in Dusseau said, the issue to be decided “is not whether the agency’s decision is the ‘best’ decision or the ‘right’ decision or even a ‘wise’ decision” under the circumstances. Id. at 1276. It can be a difficult task to review a factually-close case and yield to a deferential appellate standard of review, particularly where a video exists that may paint a visually divergent picture from the report or memory of a testifying official. Judges reviewing the video, along with the report and the hearing transcript, are likely to make differing judgments; just as hearing officers seeing the video, reading the report, and hearing the testimony of the actual officer might come away with different conclusions in this case. The legal point is that in factually-close cases, such as this one, the judicial thinking cap must be switched from “What do I believe is true?” to “What evidence supports what the hearing officer believes is true?”
Appellate second-guessing of the fact-finder’s judgment goes against the legally-required deference that promotes judicial economy and finality, which are lost if circuit courts can utilize videos as a means to negate all other record evidence. As the United States Supreme Court has noted, the “[duplication of the trial judge’s efforts in the court of appeals would very likely contribute only negligibly to the ac *467 curacy of fact determination at a huge cost in diversion of judicial resources.” Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574-75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (“[T]he parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.”).
Of course, instances may exist where video evidence can operate to contradict all other evidence on a discrete factual point (versus an overall assessment of the evidence). A video that unmistakably shows a vehicle running a red light can nullify testimony and reports to the contrary. But the quality and context of a video, like that in this case, may not capture or explain the finer nuances that the human eye of a trained (though here relatively inexperienced) DUI officer may perceive. Which explains why the officer said he picked up on some unusual movement of the vehicle or its taillights at a distance (“a good ways back at that point”) that the camera could not fully capture because the “video isn’t always the best.” What the officer believed he saw, unless entirely inconsistent with the video, is to be credited. The officer’s eyes were multi-tasking: watching the road to safely operate the patrol car while intermittently observing the vehicle’s driving pattern. He may have believed the vehicle hit the fog line at the time, but upon review of the video the vehicle did not drift quite that far — but it drifted nonetheless. These types of contextual inconsistencies between the video and the officer’s testimony/report are lost by crediting the video to the exclusion of the record as a whole.
Yet videos are increasingly becoming a part of the appellate record, raising issues about the degree of deference to be given factual findings in different contexts. Some commentators argue for less deference — and greater appellate authority to rely on video evidence — where the interest at stake, such as a criminal sentence of death or life imprisonment, hangs in the balance.
In most garden-variety appeals ... deference by a reviewing court to trial court determinations may be justified by policy values other than necessity, such as finality and judicial economy. No technological advance is likely to endanger traditional standards of review in that context. In less than routine cases, however, such as when a defendant’s life is at stake, videotaped records may provide some opportunity for much-needed improvement' in appellate oversight of state court proceedings.
Robert C. Owen & Melissa Mather, Thawing Out the “Cold Record”: Some Thoughts on How Videotaped Records May Affect Traditional Standards of Deference on Direct and Collateral Review, 2 J. App. Prac. & Process 411, 433 (2000). Others pragmatically urge for incremental change, allowing broader appellate reliance on videos establishing insular facts that need little contextual explanation, but generally defaulting to éxisting standards of review because many facts — such as a person’s mental state — require more complex initial assessments of evidence.
Discrete questions of fact, often binary in nature, are usually simple.and rarely conflict with an explicit finding of the trial judge; they are thus proper candidates for video review. Questions requiring behavioral interpretation are marked by the interpretation of behavior in the courtroom; the category includes credibility but extends also to situations that similarly implicate the interests of deference, finality, efficiency, *468 and the superiority of actual courtroom presence. Such complex questions should remain outside the purview of appellate review. The video record may “speak for itself,” but it does not and cannot speak for the visual input a judge observes and interprets that falls outside the scope of the camera, nor does it filter events and behavior through his or her experience and expertise. This fundamental reasoning behind deference should form the backbone of a theoretical framework for integrating the video record into American jurisprudence.
Bernadette Mary Donovan, Deference in A Digital Age: The Video Record and Appellate Review, 96 Va. L. Rev. 648, 676 (2010). We need not resolve the extent to which an appellate court may point to video evidence in overturning a lower tribunal’s factual findings. In the context of this case, we need only conclude that the trial court applied the “wrong law” by not sifting through the record for evidence supporting the administrative order’s factual findings.
C. Trimble is Inapplicable
Our review is not complete without consideration of this Court’s decision in Trim-ble, which Mr. Wiggins says allowed the circuit court to reject entirely the officer’s testimony and report. His theory is that the circuit court at worst misapplied Trim-ble, a case he claims is “correct law” in the context of this case. See Edenfield, 58 So.3d at 906 (“[A] misapplication or an erroneous interpretation of the correct law does not rise to the level of a violation of a clearly established principle of law.”) (internal citations and quotations omitted).
The trial court, however, did not rely upon or even mention Trimble. Instead, it anchored its legal ruling — that an appellate court is in the “exact same position” as a hearing officer in reviewing “objective” evidence involving no credibility determinations — on the Second District’s fifty-year-old decision in Julian v. Julian, 188 So.2d 896 (Fla. 2d DCA 1966). But the context and holding of Julian are of no relevance here.. Julian was a child custody case in which the trial court was presented with only a paper record consisting of pleadings, transcripts, and exhibits; no live witnesses testified and no video evidence was offered. In that evidentiary context, the Second District said:
It is our view that, as the case comes here, there is no presumption, or at best, only a slight presumption, in favor of the correctness of the custody provision. Where a trial Judge bases his Final Decree upon the written pleadings and transcribed testimony and exhibits, the Appellate Court is in the same position in examining the record as is the Trial Judge, and a presumption as to determination of evidentiary matters in not as strong as when the Judge, as the trier of the facts, personally hears the witnesses.
Id. at 898 (emphasis supplied). The italicized portions demonstrate how far afield Julian is from this case. First, the hearing officer in Mr. Wiggins’s case did not base her findings on an entirely paper record, as occurred in Julian; she heard live testimony and was in a position to make credibility determinations; and no video was involved in Julian. Second, the court in Julian abandoned the notion that an appellate court is “in the same position” as the trial court in situations where that court “personally hears the witnesses.” Whatever presumption of correctness applied to trial courts’ rulings on paper-only records was deemed “not as strong” when a trial court “personally hears the witnesses.” On its face, Julian simply has no application here. It follows that the application of an irrelevant case, such as Julian, is the application of the “wrong *469 law” — not a misapplication of the correct law.
Because the trial court applied the “wrong law” in making its ruling, no need exists to delve further into the metaphysical question of what law it might have applied. Dusseau, 794 So.2d at 1276 (“As long as the record contains competent substantial evidence to support the agency’s decision, the decision is presumed lawful and the court’s job is ended.”). Nonetheless, we address Trimble to point out that its context and narrow holding likewise make it an inapplicable precedent. One year after Dusseau was decided, this Court in Trimble reviewed the Department’s administrative suspension of Ms. Trimble’s Florida driver’s license for refusing to submit to a sobriety test. 821 So.2d at 1085. A formal administrative hearing was held, her suspension was upheld, and she petitioned the circuit court, which set aside the suspension. The circuit court found no competent substantial evidence that Ms. Trimble was given an implied consent warning prior to her refusal because the Department’s documents[4] “were hopelessly in conflict and the discrepancies on the critical facts went unexplained.” Id. at 1086. As in Julian, the contested factual issue was based solely on a paper-only record.
The Department sought second tier review, arguing the circuit court reweighed the evidence. Id. at 1085. This Court affirmed, holding that the circuit court did not reweigh the evidence; instead, it applied well-established law on what constitutes competent substantial evidence, stating the “hearing officer’s finding that Trimble was given a consent warning before her refusal could have rested as much on the flip of a coin as on the documentary evidence submitted.” Id. The petition was denied on that limited basis.
If this case involved a wholly paper record, consisting of a handful of documents that were “hopelessly” conflicting on a single discrete fact — with no other evidence supportive of the hearing officer’s order— then Trimble could apply. It does not, however. Unlike the paper-only coin-flipping conundrum in Trimble,[5] the evidentia-ry profile in Mr. Wiggins’s case is entirely different — live testimony of the arresting officer, an arrest/booking report, and the video — making Trimble inapplicable. No commonality or parallelism exists. Like Julian, Trimble falls in “wrong law” category.
What underlies much of the confusion is differentiating between a misapplication of the “correct law” and the application of the “wrong law.” As two commentators have noted, “in many cases only a Zen master could distinguish between a misapplication of the law' and an application of the wrong law,” making the task much like telling identical twins apart. Chris W. Altenbernd & Jamie Marcario, Certiorari Review of Nonfinal Orders: Does One Size Really Fit All? Part I, Fla. B.J., Feb. 2012, at 28. In a *470 universal sense, any case could be dubbed the “correct law” so long as it has not been overturned. But to be considered “correct law” for purposes of certiorari review, a precedent must be “relevant law” in the sense that it directly pertains to some issue in the case at hand. If not, a circuit court could simply apply an irrelevant case and thereby immunize its ruling from review as a “misapplication” of a “correct law.” For this reason, the “correct law” for purposes of second tier cer-tiorari review must, at a minimum, at least have a direct and relevant application to the issue at hand. Viewed in this way, even if the trial court had cited to Trimble and attempted to apply it as a basis for its ruling, doing so would not insulate its ruling from certiorari review as a “misapplication of correct law.”
D. “Miscarriage of Justice”
Not applying the correct law must also result in a “miscarriage of justice” as the supreme court has explained.
In granting writs of common-law certio-rari, the district courts of appeal should not be as concerned with the mere existence of legal error as much as with the seriousness of the error. Since it is impossible to list all possible legal errors serious enough to constitute a departure from the essential requirements of law, the district courts must be allowed a large degree of discretion so that they may judge each case individually. The district courts should exercise this discretion only when there has been a violation of a clearly established principle of law resulting in a miscarriage of justice.
Combs v. State, 436 So.2d 93, 95-96 (Fla. 1983). Expanding upon Combs, the court noted that the standard of second tier certiorari “while narrow, also contains a degree of flexibility and discretion. For example, a reviewing court is drawing new lines and setting judicial policy as it individually determines those errors sufficiently egregious or fundamental to merit the extra review and safeguard provided by certiorari. This may not always be easy since the errors in question must be viewed in the context of the individual case.” Haines City Cmty. Dev., 658 So.2d at 530-31 (footnote omitted).
Based upon these principles, which require not only a “sufficiently egregious error or fundamental” error but also a restrained exercise of judicial discretion, we conclude that the context of this case warrants relief. Failing to apply the applicable standard of certiorari review, while perhaps understandable in light of the circuit court’s view of the primacy of the video, meets this standard. See Clay County, 969 So.2d at 1181. And although this case involves only Mr. Wiggins’s suspension, the Department says that many similar cases currently exist; and if the circuit court’s method of review is permitted, that the proverbial floodgates will open by giving the green light to circuit courts to independently review and second-guess the evidentiary weight to be placed on video evidence. Under these circumstances, where no relief is otherwise available to the Department to curtail this practice, the context of this case warrants relief.
III.
The circuit court did not comply with Dusseau, which sets out the clearly-established manner in which first tier certiorari review is conducted in determining whether competent substantial evidence exists in support of an administrative fact-finding. In light of the circuit court’s order, which says the officer’s testimony and arrest/booking report by themselves would support the hearing officer’s factual find *471 ings, it might seem that a reversal is in order. But Dusseau says that a district court should not independently review the record and pass upon whether competent substantial evidence exists in support of a challenged administrative order; that is for the circuit court to do. As such, we grant the petition, quash the circuit court’s order, and remand with directions to apply the correct law. Because the issue presented arises more frequently due to the ubiquity of video evidence, we certify the following question of great public importance for possible review:
WHETHER A CIRCUIT COURT FAILS TO APPLY THE CORRECT LAW BY REJECTING AS NON-CREDIBLE THE ENTIRETY OF AN ARRESTING OFFICER’S TESTIMONY AND REPORT CONCERNING A TRAFFIC STOP, UPON WHICH THE HEARING OFFICER’S FACTUAL FINDINGS RELIED, BASED SOLELY ON THE CIRCUIT COURT’S OWN INDEPENDENT REVIEW AND ASSESSMENT OF EVENTS ON THE VIDEO OF A TRAFFIC STOP?
PETITION GRANTED.
LEWIS, C.J., concurs.
VAN NORTWICK, J„ dissents.

. See Dep’t of High. Saf. & Motor Veh. v. Edenfield, 58 So.3d 904, 906 (Fla. 1st DCA 2011) ("Clearly established law can be derived not only from case law dealing with the same issue of law, but also from an interpretation or application of a statute, a procedural rule, or a constitution provision.”).

. See Dusseau, 794 So.2d at 1273 (discussing Irvine v. Duval Cnty. Planning Comm'n, 495 So.2d 167 (Fla. 1986)).

. An example is that the circuit court erroneously relied upon a portion of the report dealing with a lane change that the officer on his own accord had voluntarily admitted was an error. The hearing officer — who actually heard the officer make this correction — was *466 in the superior position to pass judgment on this factual point; indeed, it made no finding of fact on the lane change issue, it playing no role in the hearing officer’s order.

. The Department submitted an affidavit stating that Trimble was arrested at 11:40 p.m. but inconsistently stating that a request and warning was given to Trimble at 12:45 a.m.; a printout from the Breathalyzer that reflected a refusal occurred at 12:47 a.m.; and an officer’s report said a warning was given at 12:50 a.m. 821 So.2d at 1086.

. See also Dep't of High. Saf. & Motor Veh. v. Colling,-So.3d-, 2014 WL 2532406, 39 Fla. L. Weekly D1195 (Fla. 5th DCA June 6, 2014) (hearing officer’s decision between two documents with inconsistent blood alcohol readings "amounted to nothing more than a ‘flip of a coin’ under the most favorable interpretation of the record” rendering it an "arbitrary choice of one document over another [that] does not meet the substantial, competent evidence test.”) (citing Trimble).