DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE ATTORNEY'S OFFICE OF THE SEVENTEENTH JUDICIAL CIRCUIT** and **SCHOOL BOARD OF BROWARD COUNTY,**
Appellants,

v.

**CABLE NEWS NETWORK, INC., MIAMI HERALD MEDIA COMPANY, SUN-SENTINEL COMPANY, LLC, ABC, INC., THE ASSOCIATED PRESS, THE BRADENTON HERALD, THE FIRST AMENDMENT FOUNDATION, FLORIDA PRESS ASSOCIATION, GANNETT COMPANY, INC., LOS ANGELES TIMES COMMUNICATIONS LLC, THE NEW YORK TIMES COMPANY, ORLANDO SENTINEL COMMUNICATIONS COMPANY, LLC, BROWARD COUNTY SHERIFF'S OFFICE,** and **SCOTT ISRAEL,** in his official capacity as Broward County Sheriff,
Appellees.

Nos. 4D18-1335
and 4D18-1336

[July 25, 2018]

Consolidated appeals from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jeffrey R. Levenson, Judge; L.T. Case No. CACE 18-004429 (09).

Michael J. Satz, State Attorney, and Joel Silvershein, Assistant State Attorney, Fort Lauderdale, for appellant, State Attorney's Office of the Seventeenth Judicial Circuit.

Eugene K. Pettis and Debra Potter Klauber of Haliczer, Pettis & Schwamm, P.A., Fort Lauderdale, for appellant, School Board of Broward County.

Dana J. McElroy, James J. McGuire, and Jon M. Philipson of Thomas & LoCicero, PL, Fort Lauderdale, for appellees, Cable News Network, Inc.; Miami Herald Media Company; and Sun-Sentinel Company, LLC, ABC, Inc.; The Associated Press; The Bradenton Herald; the First Amendment Foundation; the Florida Press Association; Gannett Co., Inc.; Los Angeles Times Communications LLC; The New York Times Company; and Orlando Sentinel Communications Company, LLC.

GROSS, J.

We affirm the order of the circuit court which directed the disclosure of video footage as public records over the objections of the School Board of Broward County and the State Attorney of the 17th Judicial Circuit.

On February 14, 2018, Nikolas Cruz, a former student, entered the grounds of Marjory Stoneman Douglas High School in Broward County. He walked into Building 12, containing several classrooms, and allegedly shot and killed seventeen people, including students and staff members. The timeline for the shooting is as follows:

2:19 p.m.   Cruz is dropped off near the school
2:21 p.m.   Cruz enters Building 12 and begins firing rifle
2:22 p.m.   A fire alarm is set off
2:27 p.m.   Cruz discards his weapon and exits out the west side of the building

Approximately 70 surveillance cameras are installed at Douglas. The exterior cameras are mounted in plain sight and are "completely visible" to a person looking for them. Without seeing the actual footage from the camera, one would not know:

- Whether the camera is on or off;
- Whether the camera is working;
- How wide the angle is;
- Where the camera is pointing;
- Whether the camera operates at night; or
- How many frames per second the camera is recording.

On February 15, the Broward County Sheriff's Office ("BSO") subpoenaed all of Douglas's video surveillance footage. On February 16, the BSO executed a search warrant and seized the School Board's computers which housed the footage.

Two weeks after the shooting, several media outlets petitioned for access to video recordings captured by Douglas's surveillance cameras.[1]

---

[1] The original Petition was filed by Cable News Network, Inc.; Miami Herald Media Company; and Sun-Sentinel Company, LLC. An amended petition was filed adding ABC, Inc.; The Associated Press; The Bradenton Herald; the First Amendment Foundation; the Florida Press Association; Gannett Co., Inc.; Los Angeles Times Communications LLC; The New York Times Company; and

The Media's petition was filed pursuant to Article I, Section 24 of the Florida Constitution and Chapter 119, Florida Statutes, the "Public Records Act." The respondents were the BSO, Scott Israel (BSO Sheriff), the School Board of Broward County, and Robert Runcie (Superintendent of Schools).

The Media's petition averred "extreme public interest" in "the response of law enforcement officers during the shooting and immediately thereafter." The petition mentioned school resource officer, Scot Peterson, by name. The petition was necessitated because the BSO refused to release the footage.

The State Attorney's Office moved to intervene as the authority prosecuting Cruz. The State Attorney argued that the "items sought constitute criminal investigative information" that is exempt from disclosure under the Public Records Act.

The BSO responded to the petition, raising the same exemption, and other objections not relevant to this appeal. The School Board's response claimed that the footage was exempt from disclosure under Florida Statute section 119.071(3)(a), Florida Statutes – the "security system plan exemption."

Before the hearing, the Media filed two DVDs in support of the petition. The first was a video of a press conference conducted by the BSO. In the press conference, Sheriff Scott Israel discusses the Douglas surveillance videos and informs the media that Officer Peterson was suspended based on his failure to enter Building 12 and engage the shooter.

The second DVD was an interview with a Douglas student who described seeing Officer Peterson during the shooting. According to the student, Officer Peterson stood in a stairwell in an adjacent building, talking on his radio, with his gun pointed at Building 12.

The Media also filed several exhibits including its public records request, other public records, and several articles about the shooting. The articles discussed Officer Peterson's actions as well as reports that other

Orlando Sentinel Communications Company, LLC. Additional media outlets joined by intervention: ALM Media, LLC; CBS Broadcasting Inc.; Charter Communications Operating, LLC; Fox Television Stations, LLC; Graham Media Group, Inc.; NBCUniversal Media, LLC; Scripps Media, Inc.; Univision Communications Inc.; WFTV, LLC; and WPLG Inc. The petitioners will be referred to as the "Media."

deputies remained outside during the shooting taking cover behind their vehicles. One article notes BSO policy which is that "if real time intelligence exists the sole deputy or team of deputies may enter the area and/or structure to preserve life."

The circuit judge conducted an evidentiary hearing on March 8. The evidentiary portion of the hearing included testimony from the BSO's captain of criminal investigations. The captain testified that Cruz is the subject of an active criminal investigation and that the videotapes are part of the criminal investigative information file.

The other relevant testimony about Douglas's surveillance system came from a BSO officer and an assistant principal. This testimony is discussed in more detail below.

At the close of the hearing, the judge announced that he would be doing an *in camera* review of the footage, which had been redacted to obscure the faces of students and unknown witnesses. Ultimately, the court issued its order requiring the BSO to release the footage (the "first order"). None of the parties appealed the first order, and the BSO provided the specified footage to the Media.

Shortly before the video was released, the BSO published a detailed timeline of events culled from multiple sources, including Douglas surveillance videos. The timeline revealed that there are 70 surveillance cameras at Douglas and that the cameras are motion-activated. The published timeline stated:

> The 45 acre campus is equipped to record 70 different camera angles. Most of these views provide coverage of student buildings, walkways and hallways. Building 12 was covered by thirteen interior cameras. School video time stamps are not exactly synchronized with BSO dispatch records. Cameras are also motion activated leaving gaps in coverage.

After reviewing the BSO's newly-released timeline and the footage released March 15, the Media filed a Motion for Further Relief. The Media argued that the footage released was incomplete, edited, and not entirely responsive. The Media asked for "full disclosure" showing the law enforcement response so the public could "evaluate and determine whether more could have, or should have, been done."

The School Board opposed releasing additional footage. It contended that the extensive video footage sought by the Media revealed much more

than the "minimal" footage originally produced. It further argued that the Media had not stated any "good cause" for the additional footage because the additional footage sought captured officers' actions *after* Cruz had dropped his weapon and exited the building.

The Media's motion for further relief spurred three hearings and the appealed order.

The first hearing was a case management conference held on March 23. The Media insisted that it was not seeking any footage of victims – that it was seeking only footage from the exterior cameras showing the law enforcement response. The circuit court clarified that "anyone on the video, other than law enforcement," was going to be pixelated. The BSO did not object to producing additional footage. The court ordered the Media to narrow its request.

The Media then filed its "Amended and Supplemental Motion for Further Relief." The Media specified that it was not seeking any video:

      (a) depicting the victims of the shooting,
      (b) showing the interior of any school building,
      (c) specifically identifying any student, or
      (d) depicting Nikolas Cruz.

The Media sought only video from cameras mounted on Buildings 12, 13, 6, 7, 9, 3, the gymnasium, and the auditorium which depicted law enforcement personnel responding to the shooting from 2:15-4:00 p.m.

The second hearing was conducted on April 2. The BSO stated that it was **not** opposed to releasing video showing first responders but it opposed releasing video showing victims or children's faces.

The School Board argued against releasing any more video. It argued that releasing additional video would reveal the vulnerabilities of Douglas's security system.

After clarifying what the Media was seeking and what the footage would reveal, the court found the request over-inclusive. The judge ordered that the footage to be released would stop at 3:00 p.m. An evidentiary hearing was set for April 4.

At the final evidentiary hearing, a detective testified that Cruz had been indicted and was the subject of a continuing active criminal investigation. He said that the first law enforcement personnel seen on the video is at

2:32 p.m. He testified that of the 5-6 cameras that show first responders, 3-4 were not previously produced.

The chief information officer for the BSO who oversees information technology for the entire Broward County School District testified that he is responsible for "the installation and ongoing maintenance of the surveillance cameras." He testified that surveillance cameras at Douglas are "not typically monitored," and that "no one is sitting watching those cameras but they're recording so that if you need to go back and look at the footage, you can."

A Douglas assistant principal responsible for technology, which included surveillance technology, testified that the cameras were used to monitor the students and to prevent truancy.

Another assistant principal expressed his concern that releasing video footage from more cameras would expose the school's blind spots.

A Major with the school board police supported the view that releasing the videos would show what the school was not recording, jeopardizing the integrity of the security system.

After hearing argument the court found that an *in camera* review of the redacted footage would be appropriate. Two weeks later, the court issued its "Order on Petitioners' Amended and Supplemental Motion for Further Relief," which is the subject of this appeal.

The order found the footage to be a public record and rejected the State Attorney's attempt to bar disclosure under the "active criminal investigative information" exemption.

Addressing the School Board's argument that the videos are exempt from disclosure because they "relate directly to or reveal information about security systems," the court found that the videos "minimally reveal information relating to the security system" of Douglas, but concluded that "good cause exists that permits disclosure:"

> In making this decision, this Court has balanced the public's right to be informed regarding the law enforcement response against the potential harm to the current security system. After reviewing the video recordings, this Court finds that the potential harm to the current security system is outweighed by the strong public interest in disclosure.

Upon finding good cause, the court held that section 119.071(3), Florida Statutes, did not bar disclosure of the video recordings.

The BSO was ordered to produce the redacted versions of the video recordings to the Media. The State Attorney and the School Board each timely appealed, and the videos were not released pending the outcome of this case. As a sealed part of the record on appeal, footage from the five cameras was forwarded to this court.

The videos here at issue are public records subject to disclosure within the meaning of Article I, section 24(a) of the Florida Constitution and Chapter 119, Florida Statutes (2018). The central issue before us is whether the footage is statutorily exempt from disclosure. An "exemption" is defined as "a provision of general law which provides that a specified record . . . is not subject to the access requirements of [the Public Records Act]." § 119.011(8), Fla. Stat. (2018).

The Public Records Act "is to be construed liberally in favor of openness, and all exemptions from disclosure construed narrowly and limited to their designated purpose." *Barfield v. City of Ft. Lauderdale Police Dep't,* 639 So. 2d 1012, 1014 (Fla. 4th DCA 1994). "[W]hen in doubt the courts should find in favor of disclosure rather than secrecy." *Bludworth v. Palm Beach Newspapers, Inc.,* 476 So. 2d 775, 779 n.1 (Fla. 4th DCA 1985) ("Expansion of the exemptions from disclosure, rather than of the exclusions from the categories called criminal investigative and criminal intelligence information, is the area of which the courts ought to be chary, given the overarching policy of the Public Records Act.").

We reject the State Attorney's argument that the video footage is exempt from disclosure under section 119.071(2), Florida Statutes (2018), because the footage was created before the criminal investigation began and was compiled by the School Board, not a law enforcement agency.

By statute, "active criminal investigative information" is exempt from disclosure under the Public Records Act. § 119.071(2)(c)1., Fla. Stat. (2018). "The government has the burden to demonstrate the applicability of a statutory exemption." *Rameses, Inc. v. Demings*, 29 So. 3d 418, 421 (Fla. 5th DCA 2010). In order for a public record to be exempt under the cited section, "the claimant must show that the record is both 'active' and that it constitutes 'criminal investigative information.'" *Woolling v. Lamar*, 764 So. 2d 765, 768 (Fla. 5th DCA 2000).

Criminal investigative information is information compiled by a criminal justice agency in the course of conducting a criminal investigation. The statutory definition provides:

> "Criminal investigative information" means information with respect to an identifiable person or group of persons compiled by a criminal justice agency in the course of conducting a criminal investigation of a specific act or omission, including, but not limited to, information derived from laboratory test reports of investigators or informants, or any type of surveillance.

§ 119.011(3)(b), Fla. Stat. (2018). Such information is "active" "as long as it is related to an ongoing investigation which is continuing with a reasonable, good faith anticipation of securing an arrest or prosecution in the foreseeable future [including] while such information is directly related to pending prosecutions or appeals." *Id.* § 119.011(3)(d).

The criminal investigative information exemption "furthers the critical importance of preserving the confidentiality of police records surrounding and compiled during an active criminal investigation, . . . and is intended to prevent premature disclosure of information during an ongoing investigation being conducted in good faith by criminal justice authorities." *Palm Beach Cty. Sheriff's Office v. Sun-Sentinel Co., LLC*, 226 So. 3d 969, 973 (Fla. 4th DCA 2017) (internal quotation marks and citations omitted).

However, the criminal investigative information exemption "does not exempt other public records from disclosure simply because they are transferred to a law enforcement agency." 40 Government-In-The-Sunshine-Manual, section II-C-15-a-9 at 101 (2018 Ed.);[2] *see also Tribune Co. v. Cannella*, 438 So. 2d 516 (Fla. 2d DCA 1983), *quashed on other grounds*, 458 So. 2d 1075 (Fla. 1984). The Attorney General's office has steadfastly opined that an agency's public records do not become exempt from disclosure simply because they are transferred to a law enforcement agency. *E.g.*, Op. Att'y Gen. Fla. (Dec. 13, 2006) (informal opinion); Op. Att'y Gen. Fla. 06-04 (2006); Op. Att'y Gen. Fla. 01-75 (2001).

---

[2] The Attorney General publishes the Government-In-The-Sunshine Manual "for use by public officials in navigating issues regarding the Sunshine Law." *Transparency for Fla. v. City of Port St. Lucie*, 240 So. 3d 780, 787 (Fla. 4th DCA 2018).

*Cannella* demonstrates that public records of a governmental entity do not transform into protected "criminal investigative information" because they have been transferred to a law enforcement agency. There, after a police-involved shooting, the Tampa Times sought the release of the personnel files of three Tampa police officers. 438 So. 2d at 517-18. In response, the City of Tampa first delayed production of the records and then claimed that it could not produce the records because they had been subpoenaed by the state attorney. *Id.* At 518. The Times filed a second petition against the Chief Assistant State Attorney Norman Cannella. *Id.* The trial court held that the records were exempt from disclosure as "criminal investigative information." *Id.*

The Second DCA reversed, finding that the criminal investigative information exemption did not apply to the City's public records. *Id.* at 523. The District Court rejected the state attorney's argument that by subpoenaing the records he had "compiled" the information within the meaning of the exemption. *Id.* The court found that the personnel records were "'compiled' within the meaning of the statute when the custodial agency, the city, originally accumulated the materials in them. *A law enforcement agency cannot withdraw materials from public scrutiny by deeming another 'compilation' to occur simply because it subpoenas such records.*" *Id.* (emphasis added). The court also noted that "information filed before an investigative process begins cannot be criminal investigative information." *Id.* (citing Op. Att'y Gen. Fla. 080-96 (1980)).

In sum, the videos were not "criminal investigative information" within the meaning of section 119.011(3)(b) because they were not compiled by a criminal justice agency in the course of conducting a criminal investigation.

The circuit court did not use this reasoning in deciding that the "criminal investigative information" exemption from disclosure did not apply. Nonetheless, we affirm the trial court on this issue under the "tipsy coachman" doctrine, which "allows an appellate court to affirm a trial court that 'reaches the right result, but for the wrong reasons' so long as 'there is any basis which would support the judgment in the record.'" *Robertson v. State*, 829 So. 2d 901, 906 (Fla. 2002) (quoting *Dade Cty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 644-45 (Fla. 1999)).

The School Board asserts that the surveillance footage is statutorily exempt from disclosure under the "security plan" exemption contained in section 119.071(3), Florida Statutes (2018). We hold that the "good cause" exception to this exemption applies, so that disclosure is mandated.

Information relating to the School's security system is public record. However, by statute, it is exempt from disclosure. § 119.071(3)(a), Fla. Stat. (2018); *see also* § 281.301(1), Fla. Stat. (2018).

Section 119.071 is entitled "General exemptions from inspection or copying of public records." The "security plan" exemption is found in subpart (3) which reads:

> **(3) Security and firesafety.—**
> (a) 1. As used in this paragraph, the term "security or firesafety system plan" includes all:
> > a. Records, information, photographs, *audio and visual presentations*, schematic diagrams, surveys, recommendations, or consultations or portions thereof *relating directly to the physical security* or firesafety *of the facility* or revealing security or firesafety systems;
> > b. Threat assessments conducted by any agency or any private entity;
> > c. Threat response plans;
> > d. Emergency evacuation plans;
> > e. Sheltering arrangements; or
> > f. Manuals for security or firesafety personnel, emergency equipment, or security or firesafety training.
> > 2. A security or firesafety system plan or portion thereof for:
> > > a. Any property owned by or leased to the state or any of its political subdivisions; or
> > > b. Any privately owned or leased property
> >
> > held by an agency is confidential and exempt . . .

§ 119.071(3)(a), Fla. Stat. (2018) (emphasis supplied). The language highlighted above defines an exempt "security system plan" to include "audio and visual presentations . . . relating directly to the physical security . . . of the facility." § 119.071(3)(a)1.a., Fla. Stat. (2018); *see also* 281.301(1), Fla. Stat. (2018).

Because the footage from the surveillance cameras "relates directly" to the security system at Douglas, including both its capabilities and its vulnerabilities, the footage is confidential and exempt from disclosure to the public under sections 119.071(3)(a) and 281.301(1), unless an exception to the exemption applies.

Public information that is confidential and exempt from disclosure because it is directly related to a security system "may be disclosed" upon "a showing of good cause before a court of competent jurisdiction." § 119.071(3)(a)3.d.; § 281.301(2)(d). The "good cause" statutory *exception* to the security system *exemption* reads:

> 3.    Information made confidential and exempt by this paragraph may be disclosed:
>
> $*$ $*$ $*$
>
> d.    *Upon a showing of good cause before a court of competent jurisdiction.*

§ 119.071(3)(a)3, Fla. Stat. (2018) (emphasis added).[3] The good cause exception to the security plan exemption was inserted into both exemption statutes effective April 1, 2016. Ch. 16-178, § 1, at 1-2, Laws of Fla.

The Media and the School Board look to two statutes that define or analyze "good cause." *See* § 406.135, Florida Statutes (2018) (concerning photographs of autopsies); *Dep't of Health & Rehab. Servs. v. Gainesville Sun Publ'g Co.*, 582 So. 2d 725 (Fla. 1st DCA 1991) (interpreting an earlier version of section 119.07 concerning child abuse records). We do not adopt either approach. Both statutes evaluate disclosure of records when set against an individual's not insubstantial right of privacy. Here, given the constitutional commitment to open government, the scales are weighed heavily in favor of disclosure. Also, these statutes demonstrate that the legislature is capable of elucidating "good cause" when it wishes to do so.

"[G]ood cause is not a novel concept to our jurisprudence." *Campus Communications, Inc. v. Earnhardt*, 821 So. 2d 388, 395 (Fla. 5th DCA 2002). We conclude that the legislature intended the courts to apply a common law approach to "good cause," where meaning emerges over time, on a case-by-case basis, and courts arrive at a desirable equilibrium between the competing needs of disclosure and secrecy of government records.

In *Dohnal v. Syndicated Offices Systems,* the Supreme Court considered the meaning of "good cause" when it related to a probate court's discretion to extend a creditor's time to file a claim under section 733.705(3), Florida Statutes (Supp. 1984), which did not define "good cause":

> We defined good cause in *Goldman* [*In re Goldman's Estate*, 79 So. 2d 846 (Fla.1955)], finding that it is "'a substantial reason,

---

[3] The language of section 281.301(2)(d) is identical.

one that affords a legal excuse,' or a 'cause moving the court to its conclusion, not arbitrary or contrary to all the evidence,' and not mere 'ignorance of law, hardship on petitioner, and reliance on [another's] advice.'"  79 So. 2d at 848 (citations omitted.) Judge Sharp correctly pointed out in *Williams* [*v. Estate of Williams*, 493 So.2d 44 (Fla. 5th DCA 1986)] that, "[w]hat is or is not sufficient to establish 'good cause' . . . is primarily addressed to the conscience and discretion of the probate judge."  493 So. 2d at 45.

The determination of good cause is based on the peculiar facts and circumstances of each case.  Obviously the trial court is in the best position to weigh the equities involved, and his exercise of discretion will be overruled only upon a showing of abuse.

529 So. 2d 267, 269 (Fla. 1988).[4]

Applying the Supreme Court's formulation of "good cause," the circuit judge did not abuse his discretion in deciding that the "minimal" revelation of information relating to the security system was outweighed by the public's need for the information.

It is a sad commentary on our times that there must be a full and open public discussion about (1) the type of security system that is appropriate for a large public high school and (2) the appropriate law enforcement response to an active shooter on a high school campus.  Parents have such a high stake in the ultimate decisions that they must have access to camera video footage here at issue and not blindly rely on school board experts to make decisions for them.

Here, the Media showed that the footage would reveal the response of law enforcement personnel and other first responders during and immediately after an active shooting at Douglas during school hours.  The Media showed the need for the public to actually *witness* the events as they unfolded because the narrative provided by "the authorities" is confusing and has shifted and changed over time.  Reviewing the footage would allow the public to witness and evaluate:

---

[4] The Supreme Court's formulation is consistent with the dictionary definition of "good cause" as a "legally sufficient ground or reason."  BLACK'S LAW DICTIONARY, 692 (6th ed. 1990); *see also Morrison Mgmt. Specialists/Xchanging Integrated Servs. Group, Inc. v. Pierre*, 77 So. 3d 662, 666 (Fla. 1st DCA 2011).

(1) when first responders arrived on campus;
(2) where the first responders went when they arrived on campus; and
(3) what the first responders did when they arrived on campus.

The evidence presented by the Media establishes that different sources tell different stories about the first responders' conduct. The footage itself would reveal if the first responders rushed into Building 12 to confront the active shooter, formed a perimeter, or hid in stairwells and behind their vehicles for an unreasonable length of time.

The Media established good cause because the footage reveals the conduct of public servants "discharging their assigned duties and responsibilities." *Cannella*, 438 So. 2d at 521. In addition, the footage provides insight into how Douglas's security "net," including the use of 70 unmonitored and possibly time-delayed cameras, failed to protect the students and staff on February 14.

For these reasons, we affirm the Order on Petitioners' Amended and Supplemental Motion for Further Relief in all respects. By statute, the BSO shall comply with this order within 48 hours. § 119.11(2), Fla. Stat. (2018).

KLINGENSMITH, J., concurs.
CONNER, J., concurs in part and dissents in part, with opinion.

CONNER, J., concurring in part and dissenting in part.

I concur with the majority opinion's analysis and conclusion that the surveillance video footage sought to be obtained by the appellees *does not qualify* for a public records request exemption under the section 119.071(2), Florida Statutes (2018) (the criminal investigation and criminal information exemption), but *does qualify* for an exemption under section 119.071(3), Florida Statutes (2018) (the "security plan" exemption). I respectfully dissent from the majority's holding and conclusion that the "good faith" exception to the "security plan" exemption applies, so as to authorize release of the surveillance videos. More particularly, I conclude from the record that there was insufficient substantial competent evidence to support the trial court's finding that release of the surveillance videos would "*minimally* reveal information relating to the security system."

Although the evidence showed there are 70 surveillance cameras on the Douglas campus, the appellants limited their request to video footage from

exterior surveillance cameras covering six specific buildings, plus the gymnasium and the auditorium. What the majority does not discuss in any detail is the testimony of two school board witnesses detailing their concerns that release of the surveillance videos would expose "holes" or weaknesses in the "security system net" for the campus, of which the video cameras are a major component. One of the witnesses was an assistant principal at the Douglas campus; the second witness was a Major in the school district police force. The assistant principal was responsible for overseeing the security system for the Douglas campus; the Major was responsible for developing and maintaining the security system for the entire school district, and was specifically familiar with the Douglas campus. Their testimony was in the nature of expert opinion, and the appellees did not impeach their testimony or opinions in any significant way. More importantly, the appellees called no witnesses at the evidentiary hearing and presented no conflicting or competing evidence.

With all due respect to the trial judge, there was insufficient evidence to demonstrate the exposure of the security net provided by the surveillance cameras was "minimal." It is unclear from the record how many exterior security cameras were used to generate the video footage being released. It is also unclear from the record how those cameras interface, in terms of coverage, with the other exterior cameras which did not capture law enforcement images. Without knowing such information, I submit one cannot clearly understand the extent of the exposure of weaknesses.

Common sense would lead one to conclude that a surveillance system using 70 cameras covering numerous buildings over a large campus with a large student body requires sophisticated technical analysis to determine whether gaps in camera coverage create a risk to security. Two school board employees charged with the responsibility of developing and maintaining the security system for the Douglas campus opined the release of the requested footage would expose the system's weaknesses. More importantly, the risk of exposing weaknesses in the security system did not pertain to just the Douglas campus, but to other school campuses in the district.

The trial court was free to reject the testimony and opinion of the school board witnesses. *See Hay v. Hay*, 944 So. 2d 1043, 1046 (Fla. 4th DCA 2006) ("The trial court is the judge of the facts and the credibility of the witnesses.") (citing *Santiago v. State*, 889 So. 2d 200, 203-04 (Fla. 4th DCA 2004)). However, assuming the trial court rejected the testimony, the appellee's failure to present countervailing evidence left the trial court with no evidence upon which to find the disclosure would "*minimally* reveal

information relating to the security system," or, more importantly, the weaknesses in the security system. To a lay person, it may seem that not knowing how many cameras were involved to generate the footage and how those cameras interface with other cameras in the system means the risk of exposure of weaknesses is minimal, but to persons knowledgeable about how security systems are designed and employed (through information mined from the internet or formal training), the requirement that the disclosure include all footages showing law enforcement presence would reveal information a lay person is unable to readily see and appreciate.

I completely agree that the public has the right to know and evaluate not only the response of law enforcement to an active shooter, but also what surveillance security measures school systems are using to detect the presence of unwanted intruders on public school campuses. Undoubtedly, the school board will be evaluated by the public on the already disclosed information that the surveillance camera system on the Douglas campus was not routinely monitored. But in granting an exemption to the public records law, for obvious safety reasons, the legislature did not intend for the public to know the *current* gaps in a security system. There was some evidence presented that the school board was assessing the need for changes to the current surveillance system. Once significant changes are made to the surveillance camera system, I would agree that the requested footage for February 14, 2018, should be released under the "good faith" exception, so the public can have a better understanding of what happened that day.

My final disagreement with the majority's opinion is that it does not address the request of the school board to further redact information in the video footage that reveals the camera number, the location of the camera, the camera angle, and where and how cameras are pointed at the perimeter of the campus. At a minimum, the school board's request should be granted to address the safety concerns I discuss in my dissent.

* * *

***No motion for rehearing will be entertained.***
***Mandate shall issue immediately.***